291 N.J. Super. 582 (1996)
677 A.2d 1170
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF-RESPONDENT,
v.
B.G.S., DEFENDANT-APPELLANT. IN THE MATTER OF THE GUARDIANSHIP OF M.A.S., A MINOR.
Superior Court of New Jersey, Appellate Division.
Argued May 20, 1996.
Decided July 1, 1996.
*585 Before Judges PETRELLA, SKILLMAN, and EICHEN.
Philip Harrison argued the cause for appellant (Sachs, Maitlin, Fleming, Greene & Wilson, attorneys; Mr. Harrison, on the brief).
Magali M. Francois, Deputy Attorney General, argued the cause for respondent (Deborah T. Poritz, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. Francois, on the brief).
James B. Boskey, Law Guardian, argued the cause for M.S. (Seton Hall University School of Law, Family Law Clinic, guardian ad litem).
The opinion of the court was delivered by PETRELLA, P.J.A.D.
B.G.S. challenges an order of the Chancery Division, Family Part, which terminated her parental rights as natural mother to her son, M.A.S. The order, prompted by an application made by the Division of Youth and Family Services (DYFS), conditioned the termination upon visitation between B.G.S. and M.A.S. until the initiation of adoption proceedings, at which time B.G.S. was to be given notification to permit her to pursue post-adoption visitation.[1] Although B.G.S. concedes her inability to care for M.A.S. and seeks neither removal of her son from his *586 legal guardian nor interference with his custody, she asserts that the statutory criteria for termination were not satisfied by clear and convincing evidence. DYFS cross-appeals nunc pro tunc to strike from the orders any mandated post-termination visitation or notification provisions.[2]
Our review of the record in light of the arguments presented satisfies us that there is overwhelming evidence supporting the propriety of the termination order. The conditions imposed in that order relating to post-termination visitation and notification of adoption are, however, in contravention of applicable law and are thus stricken.
B.G.S. was forty-two years old in 1994 when the DYFS complaint for termination of her parental rights proceeded to trial. She had abused drugs and alcohol since she was thirteen; her longest period of sobriety had been one year. Her first hospitalization for mental illness occurred at seventeen. She now suffers from bipolar disorder and polysubstance dependence. M.A.S.'s *587 father, A.R., has apparently shared a history of substance abuse as well.
DYFS first became aware of M.A.S. when his paternal grandfather reported on December 19, 1988, that B.G.S. had left M.A.S., her one-month-old infant son,[3] alone in her Irvington apartment and had travelled to the grandfather's South Orange home without either a coat or shoes. As there was no family member able to care for M.A.S., B.G.S. voluntarily placed him into foster care and sought hospitalization for herself. B.G.S. regained custody of M.A.S. on October 17, 1989, when he was eleven months old.
On April 17, 1990, B.G.S. contacted DYFS to report that A.R. had physically abused her and her son. In addition, B.G.S. stated that M.A.S. may have been sexually abused, either by his baby-sitter or A.R. During a DYFS investigation, the baby-sitter reported that B.G.S. had been abusing drugs and that M.A.S. had been poorly clothed, dirty, and smelly. B.G.S. was later apprehended by Summit police while she was driving eastbound in the westbound lanes of Route 24 with M.A.S. in the back seat. She had apparently suffered an acute incidence of substance abuse. When A.R. declined to care for M.A.S., DYFS again took custody of the child on July 29, 1990.
B.G.S. was initially permitted supervised overnight visitations with M.A.S. in his paternal grandmother's home. At first, he had difficulty during and in concluding these visits, throwing tantrums and pulling out his own hair. On one occasion, he had returned with bruises that appeared not to have been accidental but were nonetheless possibly attributable to his grandmother's attempts to restrain him during those tantrums. These home visits eventually ceased after M.A.S.'s grandmother declined further supervision following A.R.'s attempt to break into her home while intoxicated. In any event, DYFS had already discovered that B.G.S. had circumvented supervision by taking M.A.S. to her apartment, where he was allowed unauthorized contact with A.R.
*588 M.A.S. was psychologically evaluated in foster care for tantrums, self-abusive behavior, and unprovoked aggression towards other children, the results of which indicated that he was developmentally delayed. His aggression towards other children in his first foster home caused M.A.S. to be moved to another foster home and then to an interim foster home on August 23, 1991. The record indicates that M.A.S. was placed in his current foster home on August 27, 1991, where he has since remained.
By the spring of 1991, M.A.S. had begun to flourish in foster care and to approximate normal levels for his age despite his developmental delay. In accordance with his observations of April 12, 1991, psychologist David Sard had recommended that M.A.S. could be returned to B.G.S. if she continued to progress in her treatment. In a progress report covering the period from May through August 1991, a therapist had cautiously reported progress, but had emphasized that reunification should occur only when mother and child were likely to remain together.
While M.A.S. was in foster care, B.G.S. regularly visited with him, demonstrating interest and concern for him as well as showing some improvement in her parenting skills. B.G.S. periodically participated in therapy but soon relapsed into bouts of mental illness and substance abuse. She also separated from A.R. but later resumed cohabitation with him. The record indicates that domestic violence was commonplace in their relationship. A.R. infrequently visited with M.A.S., occasionally while under the influence of an intoxicating substance. A.R. was generally uncooperative with DYFS.
Although scheduled to return to B.G.S. on December 15, 1991, M.A.S. remained in foster care because B.G.S. had relapsed into substance abuse and mental illness following her reconciliation with A.R. Indeed, M.A.S.'s therapist reported in February 1992 that he was progressing, but that B.G.S. was experiencing difficulty. DYFS then shifted its objective from reconciliation to adoption.
*589 DYFS's expert psychologist, Frank Dyer, concluded that M.A.S. had bonded to his foster mother, that it was in his best interest not to be moved again, and that visitation with B.G.S. should therefore cease. The psychologist characterized an attempt to relocate M.A.S. as likely to be a "devastating psychological blow" of potentially permanent impact. In a June 1993 report, Dyer reiterated that it would be catastrophic to remove M.A.S. from his foster family. Dyer opined at trial that removal of M.A.S. from his foster home would likely cause "extreme psychological harm" that would be a "disaster" likely to affect his self-esteem, basic trust, and capacity to have relationships with new caretakers. The expert considered M.A.S.'s foster parents to be his "only hope for developing into a psychologically well-functioning adult."
Dyer also opined that any short-term problem posed by ending visitation with B.G.S. would not constitute a significant loss to M.A.S. According to the psychologist, it would be harmful to M.A.S. if he remained in foster care indefinitely because it promised no stability and was likely to create anxiety and uncertainty. In fact, M.A.S. had told Dyer that he wished to remain with his foster family. Although he said he would feel sad if he no longer visited with B.G.S., M.A.S. responded "maybe not" when asked whether he would like to live with B.G.S.
B.G.S.'s expert psychologist, Donald Skinner, agreed that M.A.S. had bonded to his foster family and that separation was likely to cause M.A.S. serious, long-term psychological harm. He added that separating M.A.S. from B.G.S. would similarly represent a loss, albeit not to the degree that separation from the foster family would jeopardize his mental health.
In a March 1993 psychiatric evaluation of B.G.S., Dr. Stephen Simring, a psychiatrist, concluded that B.G.S. was unable to function as a parent, but not solely because of her mental health. He determined that she was mentally capable to surrender her parental rights. An April 1994 psychiatric evaluation prepared by Dr. Ellen Platt indicated that B.G.S. was then psychiatrically stable, but involved in a highly dysfunctional relationship with *590 A.R., with whom she still cohabitated. Platt confirmed that B.G.S. could not parent M.A.S. and that her maximal relationship with him could only be supervised visitation.
According to Platt, B.G.S. was afflicted with a bipolar disorder, manic depression, the nature of which is the unpredictability of its cycles. A person with the disorder may suddenly become psychologically unstable for no apparent reason, even if faithfully taking medication. The inherent instability of the disease is exacerbated by drug abuse. Because B.G.S. lacked a support system, Platt concluded that B.G.S. was not capable of caring for M.A.S. on a sustained basis. Moreover, she testified that B.G.S. had impaired judgment and limited ability to cope with stress.
By May 1994, A.R. was HIV-positive and had continued to abuse drugs and alcohol. B.G.S. nevertheless justified her continued cohabitation with A.R. on the ground that she could not abandon him because he was sick and his family had rejected him. B.G.S. claimed that she would discontinue her relationship with A.R. if necessary to continue seeing M.A.S.B.G.S. admitted, however, that DYFS had always made it clear to her that she could not regain custody of M.A.S. so long as she cohabitated with A.R. Furthermore, B.G.S. conceded that she could not parent M.A.S. and offered no plan for M.A.S. other than indefinite foster care until such time as she overcame her mental illness and drug abuse. As of the time of trial, B.G.S. had purportedly abstained from illicit drugs and alcohol for five and one-half months. Even so, M.A.S.'s foster parents wish to adopt him and object strenuously to any post-termination visitation or notice to B.G.S. of the adoption proceeding.

I.
B.G.S.'s contention that DYFS has failed to prove the statutory criteria by clear and convincing evidence is without merit. R. 2:11-3(e)(1)(A) and (E). The Family Part Judge's finding that B.G.S. was not able to care for M.A.S. and that he had so bonded to his foster parents that removal would cause him *591 irreparable harm are fully supported in the record. Indeed, the judge emphasized that clear and compelling evidence had persuasively established the need to terminate B.G.S.'s parental rights despite the fact that he also authorized post-termination visitation.
Notwithstanding their profound nature, parental rights are not inviolate when a child's physical or mental health is jeopardized. New Jersey Division of Youth & Family Services v. A.W., 103 N.J. 591, 599, 512 A.2d 438 (1986). N.J.S.A. 30:4C-15.1 codifies the four-prong test set forth in A.W. and provides that DYFS shall initiate an action to terminate parental rights in the child's best interest if
a. [t]he child's health and development have been or will continue to be endangered by the parental relationship;
b. [t]he parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his foster parents would cause serious and enduring emotional or psychological harm to the child;
c. [t]he division has made diligent efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
d. [t]ermination of parental rights will not do more harm than good.
Each of these statutory elements must be established by clear and convincing evidence. In re Guardianship of J.C., 129 N.J. 1, 10, 608 A.2d 1312 (1992). These standards are "fully consistent with constitutional doctrine." Id. at 9, 608 A.2d 1312.
The judge found that B.G.S.'s ability to adequately care for M.A.S. has endangered his health and development. We reject B.G.S.'s contention that the first prong of the statute could not have been satisfied because M.A.S.'s mental and emotional well-being improved in foster care despite her visits. Overwhelming evidence clearly and convincingly established that M.A.S. was initially harmed by B.G.S.'s inability adequately to care for him and to protect him from A.R. and that M.A.S. is subject to continued psychological damage because of his need for a permanent home and identity. Evidence of serious emotional injury or *592 developmental delay satisfies this prong. In re Guardianship of K.L.F., 129 N.J. 32, 44, 608 A.2d 1327 (1992).
Moreover, harms attributable to a biological parent include the prolonged inattention to a child's needs, which encourages the development of a stronger, "bonding relationship" to foster parents, "the severing of which would cause profound harm...." In re Guardianship of J.C., supra, 129 N.J. at 18, 608 A.2d 1312. The experts agreed that M.A.S. had bonded with his foster family and would suffer serious, long-term psychological harm if removed from the foster home.
The record clearly evinces B.G.S.'s inability or unwillingness to resolve the problems with respect to her mental health and substance abuse, thus satisfying the second prong of the A.W. test. M.A.S.'s long participation in foster care distinguishes this case from In re A., 277 N.J. Super. 454, 471-472, 649 A.2d 1310 (App. Div. 1994), where there was disagreement with the permanency of the harm to the child resulting from separation from the foster parents.
Unlike the situation in In re A., B.G.S. conceded her inability to parent or care for M.A.S. Her drug and alcohol addiction was complicated by chronic mental illness as well as by her continued cohabitation with A.R. in direct contravention of DYFS's clear admonition that M.A.S. could not be returned to her under such circumstances. We are convinced, therefore, that it would not be in the best interest of M.A.S. to prolong the resolution of his status by indefinitely extending his current foster care placement.[4]N.J.S.A. 30:4C-53.4 and 30:4C-60(d) effectuate the legislative policy that children be placed in "stable and permanent homes" instead of indefinite long-term foster care. See N.J.S.A. 30:4C-53.1d. The record amply demonstrates that M.A.S. needs stability and relief from the anxiety associated with his lack *593 of permanency. The Family Part Judge appropriately concluded that further delay would harm M.A.S.
As to the third prong, there is little dispute that DYFS was diligent in its efforts to assist B.G.S. When DYFS's efforts to remedy the underlying family problems indicated that there was no prospect of rehabilitation and no available family member to provide care for M.A.S., the lack of any alternative to foster care became readily apparent. The child's need for stability and attachment had become paramount. See DYFS v. A.W., supra, 103 N.J. at 609-610, 512 A.2d 438.
The fourth prong of the A.W. test addresses the effect of termination. A court should hesitate to terminate parental rights in the absence of a permanent plan that will satisfy the child's needs. See id. at 610-611, 512 A.2d 438. The Family Part Judge appropriately concluded that termination here would not do more harm than good as DYFS had a permanent plan in the form of adoption.
B.G.S. nonetheless contends that this prong could not have been satisfied in light of expert testimony that M.A.S. would be saddened if visitation with B.G.S. ceased, even though he wished to remain with his foster parents and was better off doing so. In determining whether the child's bonding with the foster parent in itself justifies termination of parental rights, "[t]he standard is not that the end result cause no pain or trauma but that the child be kept from its parents only to avoid serious and lasting harm." In re Guardianship of K.L.F., supra, 129 N.J. at 45, 608 A.2d 1327. Thus, the child's separation from the foster parents must be shown to threaten "serious and enduring emotional or psychological harm." In re Guardianship of J.C., supra, 129 N.J. at 19, 608 A.2d 1312. Such was the case here. In any event, the present termination action was not predicated upon bonding, but rather reflected M.A.S.'s need for permanency and B.G.S.'s inability to care for him in the foreseeable future. The record supports the conclusion that greater harm is likely to befall M.A.S. by perpetuating any relationship with his natural mother. *594 DYFS satisfied the four-prong test in A.W., and the Family Part Judge accomplished the goal of securing a permanent resolution of M.A.S.'s status through his decision. DYFS v. A.W., supra, 103 N.J. at 610, 512 A.2d 438.

II.
We turn next to DYFS's objection to the termination order inasmuch as it authorized B.G.S. to continue visitation with M.A.S. pending adoption proceedings, of which she was to be notified presumably to allow her the opportunity to seek continued visitation rights or to object to the adoption. In imposing the visitation and notice conditions on termination, the Family Part Judge acknowledged that his authority to order post-termination visitation between the child and the biological parent was by no means clear under present law. His stated intention was to provide visitation in M.A.S.'s best interest "until some Appellate Court ... tells me I ... can't do that."
At the outset, we distinguish between visitation acquiesced in by foster or adoptive parents and visitation ordered by a court notwithstanding termination of parental rights. Although some of our cases have discussed potential continued visitation by natural parents after termination of parental rights or adoption,[5] we hold *595 that the definition of best interest does not include post-termination visitation where an objection is raised. Our Supreme Court explained in In re Adoption of a Child by D.M.H., 135 N.J. 473, 491, 641 A.2d 235, cert. denied sub nom, Hollingshead v. Hoxworth, ___ U.S. ___, 115 S.Ct. 433, 130 L.Ed.2d 345 (1994), that New Jersey courts, like those of most jurisdictions, do not recognize the parental right of visitation following a final order of adoption by non-relative, adoptive parents.
In New Jersey Division of Youth & Family Services v. D.C., 118 N.J. 388, 395, 571 A.2d 1295 (1990), termination under N.J.S.A. 30:4C-11 to -24 was held to have ended a child's visitation with its biological parents. "Termination of parental rights permanently cuts off the relationship between children and their biological parents." In re Guardianship of J.C., supra, 129 N.J. at 10, 608 A.2d 1312. The potential harm in cutting off access to a biological parent is an inherent feature of termination, necessary to achieve the greater good of securing for the child a permanent home. Id. at 26, 608 A.2d 1312.
We have acknowledged the absolute nature of the language in N.J.S.A. 30:4C-20 to -22 as to the post-termination guardianship authority of DYFS. See In re Guardianship of R.O.M.C., 243 N.J. Super. 631, 633-634, 581 A.2d 113 (App.Div. *596 1990). The natural parent in R.O.M.C. had intended the "open adoption"[6] of her children by foster parents. Even though intervening events could have disturbed that plan, we upheld the absolute authority of DYFS to allow visitation there on an informal basis. We nonetheless reversed and remanded a portion of the termination order, however, on the ground that the judge could not order continued visitation, especially given the unconditional authority of DYFS over the child following termination. 243 N.J. Super. at 634, 581 A.2d 113; see New Jersey Division of Youth & Family Services v. Torres, 185 N.J. Super. 234, 242, 447 A.2d 1372 (J. & D.R. Ct. 1980), aff'd. o.b., 185 N.J. Super. 182, 447 A.2d 1343 (App.Div. 1982).
The New York Court of Appeals has similarly concluded that post-adoptive visitation between a child and the biological family, regardless of the desirability of such "open adoptions," could not be incorporated into a termination order where a New York statute spoke unequivocally of termination of all parental duties and responsibilities. See In re Gregory B., 74 N.Y.2d 77, 544 N.Y.S.2d 535, 542, 542 N.E.2d 1052, 1059, reargument denied sub nom., In re Willie John B., 74 N.Y.2d 880, 547 N.Y.S.2d 841, 547 N.E.2d 96 (1989). The same result would appear inevitable under New Jersey's recently amended private adoption statute, N.J.S.A. 9:3-50a, which likewise provides for the complete termination of parental rights upon the entry of an adoption judgment.[7]See In *597 re Adoption of Child by D.M.H., supra, 135 N.J. at 491, 641 A.2d 235 (articulating New Jersey's policy of protecting adoptive parents from interference in relationship with child by natural parents whose parental rights had been voluntarily surrendered or judicially severed); see also N.J.S.A. 9:3-45(b)(2) (expressly precluding notice of adoption proceeding to parent whose rights have been previously terminated).
We view the legislative policy of protecting adoptive families from disruption as strongest in cases where DYFS must take legal action to terminate parental rights. As DYFS argued in In re Guardianship of R.O.M.C., supra, 243 N.J. Super. at 633, 581 A.2d 113, the adoption prospects of all of its wards would be diminished if prospective adoptive parents learned that orders terminating the biological parents' rights could be conditional. The biological mother in R.O.M.C. opposed termination but favored the adoption. Although the parties in that case had agreed to continue visitation voluntarily, DYFS and the adoptive parents had opposed the mandatory order because they feared that it would have required continued visitation even if the biological mother's mental illness worsened to such a degree as to make continued visitation inimical to the child's best interest. Ibid. In this case, where B.G.S. has actively sought to retain parental rights, the foster (prospective adoptive) parents have essentially invoked this State's policy of protecting adoptive families from disruption by adamantly opposing post-adoption visitation here for comparable reasons.
Where termination is based solely upon the child's bonding with its foster parents, we have suggested alternatives that have included either a gradual transition back to the custody of the biological family or continued foster care with regular visitation of the *598 biological parents, but not termination with continued visitation by the biological parents. See New Jersey Division of Youth & Family Services v. T.C., 251 N.J. Super. 419, 440-441, 598 A.2d 899 (App.Div. 1991). We find unpersuasive the reasoning of cases in other jurisdictions, which have addressed the voluntary surrendering of parental rights subject to visitation in a manner supporting notification of adoption proceedings and perhaps post-adoption visitation when found to be in the child's best interest. See, e.g., In re S.A.H., 537 N.W.2d 1, 6-7 (S.D. 1995); Petition of Dep't of Social Services to Dispense with Consent to Adoption, 392 Mass. 696, 702, 467 N.E.2d 861, 866 (Mass. 1984); In re Adoption of Francisco A., 116 N.M. 708, 714, 866 P.2d 1175, 1181 (App. 1993).
Nor does any theory advocating such visitation and notification provisions demonstrate the propriety of compulsory post-adoption visitation here.[8] Permitting voluntary agreements for visitation where biological parents voluntarily surrender their right is not the same as authorizing courts to mandate post-adoption visitation in involuntary termination cases.[9]See, e.g., Michaud v. Wawruck, *599 209 Conn. 407, 414, 551 A.2d 738, 741 (Conn. 1988) (enforcing as not violative of public policy pre-adoption agreement between biological and adoptive parents providing for post-adoption visitation if in child's best interest); Weinschel v. Strople, 56 Md. App. 252, 261, 466 A.2d 1301, 1305 (1983) (biological mother's consent to step-mother's adoption of child may be conditioned upon post-adoption visitation).
In In re Adoption of Ridenour, 61 Ohio St.3d 319, 326-328, 574 N.E.2d 1055, 1062-1063 (Ohio 1991), the Ohio Supreme Court concluded that the finality of adoption and the establishment of the adoptive family is ultimately in the child's best interest and that the biological family's desire to maintain some relationship must succumb to the paramount need to cement the new family relationship. Likewise, our termination statute is expressly predicated upon termination being in the child's best interest. N.J.S.A. 30:40C-15.1; In re Guardianship of J.C., supra, 129 N.J. at 8, 608 A.2d 1312.
Even if post-termination visitation may be in the best interest of some child, the record here did not support the Family Part Judge's findings with respect to B.G.S.'s right to visitation with her son. No witness in this case contended that continued visitation was in M.A.S.'s best interest. To the contrary, Dyer characterized M.A.S.'s loss of his relationship to B.G.S. as a short-term problem, not a significant loss. Skinner also described it as a loss, but not one that would jeopardize M.A.S.'s mental health.
The order of termination of parental rights of B.G.S. is affirmed. The visitation and notification provisions of the judge's termination order are reversed.
NOTES
[1] At oral argument, we were informed that B.G.S. paid a "final visit" to her son in June 1995. She has not sought to exercise her right to visitation during the pendency of this appeal.
[2] Although originally acquiescing, DYFS has objected to the visitation and notification provisions being included in the Family Part's termination order. During the pendency of this appeal, DYFS moved for summary disposition to strike those provisions from the order. That motion was only considered recently and was denied in the face of the imminent consideration of this calendared appeal.

Ordinarily, a respondent must cross-appeal in order to obtain relief from a judgment. See, e.g., In re Liquidation of Integrity Ins. Co., 281 N.J. Super. 364, 374, 657 A.2d 902 (App.Div.), leave to appeal granted, 142 N.J. 510, 665 A.2d 1104 (1995); Semexant v. MIL Ltd., 252 N.J. Super. 318, 322-323, 599 A.2d 935 (App.Div. 1991). A respondent need not file a cross-appeal in order to raise all arguments supported by the record in defense of a judgment. See, e.g., Chimes v. Oritani Motor Hotel, Inc., 195 N.J. Super. 435, 443, 480 A.2d 218 (App.Div. 1984); Seton Co. v. City of Newark, 194 N.J. Super. 499, 508, 477 A.2d 397 (App.Div.), certif. denied, 99 N.J. 152, 491 A.2d 667 (1984). Even absent the filing of a cross-appeal, we will grant relief in extraordinary circumstances. See, e.g., In re Estate of Karas, 197 N.J. Super. 642, 485 A.2d 1083 (App.Div. 1984). After oral argument DYFS moved for leave to file the cross-appeal nunc pro tunc. We have granted that motion as well as its motions for stay of the visitation and notification provisions of the order.
[3] M.A.S. was born on November 15, 1988.
[4] We note that M.A.S. had been in foster care for most of his five and one-half years by the time of the trial.
[5] Our Supreme Court has declined to reach the question of when post-termination visitation may be appropriate. See In re Adoption of a Child by D.M.H., 135 N.J. 473, 494, 641 A.2d 235, cert. denied sub nom., Hollingshead v. Hoxworth, ___ U.S. ___, 115 S.Ct. 433, 130 L.Ed.2d 345 (1994); In re Guardianship of J.C., supra, 129 N.J. at 26, 608 A.2d 1312.

N.J.S.A. 9:3-37 does advocate liberal construction of the adoption act to promote the child's best interest. Relying upon Kattermann v. DiPiazza, 151 N.J. Super. 209, 376 A.2d 955 (App.Div. 1977), and In re Adoption of Children by F., 170 N.J. Super. 419, 406 A.2d 986 (Ch.Div. 1979), one commentator has suggested that New Jersey law thus permits post-termination visitation to promote the child's best interest. See Annotation, Postadoption Visitation by Natural Parent, 78 A.L.R. 4th 218, 239-242 (1990).
In Kattermann v. DiPiazza, supra, 151 N.J. Super. at 213, 376 A.2d 955, we considered a situation in which the adoptive grandparents of a fifteen-year-old child had consented to extensive informal visitation, including long periods of child care while they worked, between the biological mother and child until shortly before the court action. We did not order visitation there, however, but rather remanded for a plenary hearing to determine whether visitation was in the child's best interest, noting under the "highly unusual" facts presented that the policy of protecting adoptive parents from disruption within the context of intra-family adoptions was "outside the zone of primary concern of the Legislature in enacting N.J.S.A. 9:3-17 et seq." Id. at 212-214, 376 A.2d 955. The intra-family context presented by Kattermann thus distinguishes that case from the instant appeal.
Nor does In re Adoption of Children by F., supra, 170 N.J. Super. 419, 406 A.2d 986 support post-termination visitation here. The applicable statute there was the former version of N.J.S.A. 9:3-50a, amended by P.L. 1993, c. 345, which had provided that adoption would not alter the relationship between the child and the biological parent consenting to the adoption by a step-parent. 170 N.J. Super. at 422, 406 A.2d 986.
[6] An "open adoption" is one in which the final judgment incorporates the parties' pre-adoption written agreement "that the child will have continuing contact with one or more members of his or her biological family after the adoption is completed." Amadio and Deutsch, Open Adoption: Allowing Adopted Children To "Stay In Touch" With Blood Relatives, 22 J.Fam.L., 59, 60 (1983-1984). Insofar as the record and our research discloses, theories of the advocates of non-consensual open adoptions have not been shown to be workable.
[7] D.M.H. also analyzed the legislative history of recent amendments to the private adoption statute and noted the Senate Judiciary Committee's express omission of provisions relating to "open adoptions," described by the committee as a "significant policy issue which should be addressed in separate legislation." In re Adoption of Child by D.M.H., supra, 135 N.J. at 494, 641 A.2d 235 (quoting Senate Judiciary Committee, Statement to Senate Bill No. 685 (1993)). In the absence of express provisions for "open adoption" in the private-adoption statute, D.M.H. thus concluded that post-termination visitation may not be judicially mandated without regard to the validity of a visitation provision in a voluntary and consensual pre-adoption agreement between the biological and adoptive parents. Ibid.
[8] See, e.g., Appell, Blending Families through Adoption: Implications for Collaborative Adoption Law and Practice, 75 B.U.L.Rev. 997, 1040 (1995) (observing that "[c]ourts have ordered postadoption visitation when the parties have agreed that such visitation should occur and when the courts have found such visitation is in the best interest of the child.") (footnote omitted and emphasis supplied); Amadio and Deutsch, supra (22 J. Fam. L. at 83-86) (discussing feasibility of open adoptions "where the child, the birth parents and the foster family desired the foster parents to adopt the child and where all parties to the adoption desired the biological parent or parents to maintain some contact with the child and adoptive family") (footnotes omitted and emphasis supplied). Under the circumstances of this case, we find no advantage for M.A.S. in compelling his visitation with his mother, who has been diagnosed with bipolar disorder and polysubstance dependence, based solely upon the application of a social theory that has not been tested in the crucible of the sobering reality now facing this child.
[9] Furthermore, cases that grant grandparents visitation rights are also distinguishable because such rights are often created by statute. See, e.g., N.J.S.A. 9:2-7.1; Bopp v. Lino, 110 Nev. 1246, 1251 n. 2, 885 P.2d 559, 562 n. 2 (Nev. 1994); Oregon ex rel. Costello v. Cottrell, 318 Or. 338, 345, 867 P.2d 498, 502 (Or. 1994); In re Robinson, 517 So.2d 477, 479 (La. Ct. App. 1987); Scranton v. Hutter, 40 A.D.2d 296, 339 N.Y.S.2d 708, 711 (1973). The same is true with respect to siblings. See, e.g., In re Adoption of Anthony, 113 Misc.2d 26, 448 N.Y.S.2d 377, 380 n. 14 (N.Y. Fam. Ct. 1982).