# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5169-17T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

M.L.,

     Defendant-Appellant,

and

U.W. and A.B.,

     Defendants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF Y.W.,
AD.B., MAK.L., and E.L.,

     Minors.

_____

Submitted September 23, 2019 – Decided October 7, 2019

Before Judges Fasciale, Moynihan and Mitterhoff.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FG-13-0070-17.

Joseph E. Krakora, Public Defender, attorney for appellant (Deric D. Wu, Assistant Deputy Public Defender, of counsel and on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason Wade Rockwell, Assistant Attorney General, of counsel; Joann Marie Corsetto, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, attorney for minors (Melissa R. Vance, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendant M.L. (the mother) appeals from a June 22, 2018 order terminating her parental rights to four of her five children: (1) Y.W. (Yolanda), born in 2004; (2) E.L. (Edward), born in 2007; (3) Ad.B. (Ashley), born in 2011; and (4) Mak.L. (Michael), born in 2016.[1] The mother, who did not attend the trial, argues that the Division of Child Protection and Permanency (Division) did not prove by clear and convincing evidence prong four of the statutory best

---

[1] We use pseudonyms to protect confidentiality. Defendant U.W., the father of Yolanda and Edward, has not appealed from the termination of his parental rights. Defendant A.B., Ashley's father, made a voluntary identified surrender of his parental rights. Michael's father is unknown. Defendant's fifth child is not involved in this action.

interests of the child standard under N.J.S.A. 30:4C-15.1(a)(4). We disagree and affirm.

In January 2013, the Division received a referral that Yolanda had not attended school for two months. The Division investigated, and the mother admitted that she did not enroll Yolanda in school when the family moved in with the maternal grandmother. The mother's plan was to stay with family members until she obtained independent housing, for which she had been searching. With assistance from the Division, the mother enrolled Yolanda in school. The Division found the allegations of educational neglect were unfounded. It then closed the case because there were no concerns for the children's health or safety.

About eighteen months later, the Division received another referral. This allegation was that the mother was using drugs, and the children were not regularly attending school or receiving necessary medical care. The Division investigated the referral and determined that the allegations were unfounded, but endeavored to assist the family.

The mother continued struggling with housing solutions. In February 2015, police officers responded to a call that the mother and her children had no place to sleep, and that they needed help in finding a place to stay for the night.

A-5169-17T2

The officers assisted the family by returning them to the maternal grandmother's apartment.

The housing problems continued. In May 2015, the Division received an allegation that the mother had moved five times in the past year, from relative to relative and motel to motel. The caller said the mother only had enough money to stay at the current motel until the end of the week, and Yolanda had missed a lot of school.

The Division investigated these allegations, and the mother acknowledged that the children had been missing school because of a lack of transportation from the motel. She stated that she was not working. The mother further expressed that she had exhausted the housing and financial assistance available to her from the government, which the Division confirmed with the Board of Social Services. The Division paid motel expenses for the family. It provided transportation assistance when the mother and her family stayed with various relatives.

About a month later, during the Division's ongoing involvement with the family, the Division received a report that Ashley's father ripped a corn row out of Ashley's scalp and threatened to kill the mother and her family. The Division investigated the report and found the allegations had not been established by a

4

preponderance of the evidence. However, the mother obtained a restraining order against Ashley's father and moved to a domestic violence shelter with Ashley; Yolanda and Edward later joined them.

The domestic violence shelter worked to find transitional housing for the mother upon her discharge and extended her stay pending resolution of her housing application with Family Promise. The shelter was unable to extend the mother's stay after Family Promise rejected her application, and the mother's housing problems continued. In September 2015, the Division removed the children because the shelter evicted the mother, and her family had no place to live.

The mother threatened suicide, and a hospital admitted and treated her for depression. While there, the mother learned that she was pregnant, and she told her Division caseworker that the pregnancy was the result of a sexual assault. In mid-September 2015, the hospital discharged the mother, and she started living with a relative. She did not participate in the recommended outpatient treatment.

In January 2016, the mother gave birth to Michael. The Division removed Michael from the mother's care because she was unprepared for his arrival. She did not have stable housing, nor did she remediate the mental health concerns

5

previously noted by the Division. The Division continued supervising and providing services to the family. The mother's situation, however, did not substantially improve. In August 2016, she progressed to unsupervised overnight weekend visits in addition to continued weekday visits with her children. But the mother did not take the children out of the motel room, including during her visit over the entire Thanksgiving weekend. The children were bored, and sometimes Ashley or Yolanda declined visits. The Division offered the mother transportation assistance during the visits and passes to a nearby park, but she never took advantage of these offers.

In August 2016, the Division received another referral. This time, the Division learned that the mother went to work and left the children alone during their overnight and unsupervised visitation. The Division investigated, and it concluded that the mother left the children alone for fewer than two hours, during which she communicated with Yolanda by phone. Because of Yolanda's cognitive delays, the Division was concerned that the mother left Yolanda in charge of the younger children. Nevertheless, the Division found the allegations of neglect and inadequate supervision were not established, so the mother's visits remained unsupervised.

A-5169-17T2

The mother's mental health remained an issue. The Division scheduled the mother for a psychological evaluation in 2016, but she refused to attend. The mother did not regularly attend therapy, and she was noncompliant with her antidepressant medications. In June 2017, the mother told her caseworker that she had no health insurance and could not pay for counseling or medication management. The Division provided assistance by reinstating these services. However, the mother remained noncompliant.

Inadequate housing remained a problem too. The Division gave the mother housing assistance, but she was uncooperative. She never obtained housing suitable for herself and the children. Instead, she lived either in a motel or with relatives who were unable to accommodate her family because the relatives did not have enough room for the mother's children.

In addition, the Division provided the mother with assistance in obtaining her GED, including free tutoring and transportation. But she never took advantage of this assistance. The Division also sought out family support for the mother, attempting to facilitate dialogue between her and her siblings. However, once again, the mother was uncooperative. The Division helped the mother find work, and although she found work at a factory as of April 2016, she was unemployed by June 2017. Thereafter, in approximately

7

January/February 2018, the Division learned that the mother was working at a factory in Pennsylvania.

Around January 2017, the mother expressed thoughts of suicide and received emergency mental health treatment. Although the Division continued offering services to address the mother's mental health problems, she did not participate in the referred long-term care. Her mental health issues and inadequate housing continued while the children lived at the placements.

In August 2017, Yolanda and Ashley were moved to a pre-adoptive resource home. In October 2017, Michael was moved to the same resource home. The resource parent included Edward in family outings and vacations with his siblings, and she expressed an interest in taking Edward into her home and adopting all four children. In March 2018, the mother stopped communicating with the Division and stopped attending visitation with the children.

The mother never offered any possible relative placements for the children. The Division considered placing the children with U.W.'s mother, but ruled her out due to prior substantiations with the Division. The Division considered placement with U.W.'s significant other, but ruled her out due to outstanding criminal matters. The Division also considered the mother's sister,

but ruled her out because she did not want to care for the children. Therefore, there were no viable family placement options.

Judge Kondrup-Coyle conducted the trial. Division caseworkers Jorge Agosto, Fernanda Valerio, Dayna Roselli, and Kristen Shannon testified. They stated that the concerns that led the Division to seek the termination of the mother's parental rights related to the mother's failure to remediate her mental health issues and her chronic homelessness. The Division produced testimony from its psychological expert, Dr. David Brandwein, who provided opinion testimony as to his evaluations.

Dr. Brandwein diagnosed the mother with major depressive disorder, recurrent and severe, with anxious distress, as well as post-traumatic stress disorder. He also found that she had paranoid, schizoid, and avoidant personality features. He opined that the mother was unable to safely parent her children due to her persistent housing problems, her unstable employment, and her failure to acknowledge or address her mental health issues, which negatively affected her day-to-day functioning.

Regarding bonding, Dr. Brandwein had no doubt that the mother loved her children, and they loved her. But he found few signs of a secure bond between the mother and her children. The three older children knew who their

mother was, but in the doctor's opinion, their interactions with her were not consistently indicative of a parent-child bond. The youngest child did not appear to have a bond with the mother at all.

Dr. Brandwein opined that, should the mother's parental rights be terminated, Yolanda, Edward, and Ashley would suffer a transitory grief reaction that could be remediated through therapy and their relationship with the resource parent. He did not believe the children would suffer enduring harm. As for Michael, Dr. Brandwein did not believe he would have any reaction should his relationship with the mother be terminated. Dr. Brandwein believed it was in the children's best interests for the mother's parental rights to be terminated so the Division could seek permanency for them. In his opinion, delaying permanency would exacerbate the children's feelings of uncertainty and cause them further harm.

In Brandwein's opinion, "a positive, reciprocal relationship [was] developing between [the resource parent] and the three minor children" in her care. He believed that over time they would develop a secure bond and that the resource parent, who had expressed her willingness to adopt all four children, was capable of supporting the children into adulthood. Thus, the doctor recommended that the Division seek permanency for all four children with the

resource parent. In June 2018, Edward was placed in the same resource home as his siblings.

The judge found that the Division proved all four prongs of the statutory standard by clear and convincing evidence. As to the first three prongs, the judge found that the mother had been unable to provide the children with a safe and stable home, and she continued to be unable to do so, notwithstanding the Division's extensive efforts to assist her in obtaining treatment for her mental health issues, a GED, employment, and housing. Also, the judge found that the children would be harmed by further delays in permanency. In the judge's opinion, "there's no word big enough for how much the Division did in this case," but the mother "did not want the help" because her depression negatively affected every aspect of her life. Moreover, the judge found that the mother had "shut down completely," as she stopped visiting her children and attending court proceedings.

The applicable law and standard of review are well settled. "Parents have a constitutional right to raise their children." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 447 (2012). But, "that right is not absolute." Ibid. "It is a right tempered by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or

may be seriously endangered by a neglectful or abusive parent." Ibid. (emphasis in original).

Under N.J.S.A. 30:4C-15.1(a), the Division

> shall initiate a petition to terminate parental rights on the grounds of the "best interests of the child" . . . if the following standards are met:
>
> (1)    The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2)    The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3)    The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4)    Termination of parental rights will not do more harm than good.

"The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." In re Guardianship of K.H.O.,

161 N.J. 337, 348 (1999). <u>Accord</u> <u>F.M.</u>, 211 N.J. at 448; <u>N.J. Div. of Youth & Family Servs. v. I.S.</u>, 202 N.J. 145, 166-67 (2010); <u>N.J. Div. of Youth & Family Servs. v. P.P.</u>, 180 N.J. 494, 506 (2004).

When parents contest the termination of their parental rights, the court's function is to decide whether the parents can raise the child without causing further harm. <u>In re Guardianship of J.C.</u>, 129 N.J. 1, 10 (1992). "The burden falls on the State to demonstrate by clear and convincing evidence that the natural parent has not cured the initial cause of harm and will continue to cause serious and lasting harm to the child." <u>Ibid.</u>

"Because of the elemental nature of the parent-child relationship, and recognizing that the severing of that relationship is among the most 'severe and . . . irreversible' forms of state action, . . . 'all doubts must be resolved against termination of parental rights.'" <u>N.J. Div. of Youth & Family Servs. v. E.P.</u>, 196 N.J. 88, 102-03 (2008) (citations omitted). "Severing the ties between a child and a parent" must be viewed as "a weapon of last resort in the arsenal of state power." <u>F.M.</u>, 211 N.J. at 447.

As to prong four – the sole challenge by the mother – the Division must prove by clear and convincing evidence that "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). This prong

"serves as a fail-safe against termination even where the remaining standards have been met." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 609 (2007).

It does not require "a showing that no harm will befall the child as a result of the severing of biological ties." K.H.O., 161 N.J. at 355. Rather, the question to be addressed is whether, "after considering and balancing" the relationships between the children and the biological parent, and the children and the resource parent, the children will suffer greater harm from the termination of ties with the biological parent than from the permanent disruption of their relationship with the resource parent. Ibid.

In engaging in this analysis, the court should be cognizant of the children's need for permanency. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 559 (2014); K.H.O., 161 N.J. at 357-58. Also, the court must consider the permanency plan offered by the Division. N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 610-11 (1986). "Ultimately, a child has a right to live in a stable, nurturing environment and to have the psychological security that his most deeply formed attachments will not be shattered." F.M., 211 N.J. at 453. Therefore, the Division may establish the fourth prong where the biological parent remains unable to care for the children in the foreseeable future, and

termination will provide the children an opportunity for permanency. N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 593 (App. Div. 1996).

Of course, our review of a trial court's termination of parental rights is limited. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 278 (2007). An appellate court must uphold the trial court's factual findings if they are supported by adequate, substantial, credible evidence in the record. F.M., 211 N.J. at 448-49; M.M., 189 N.J. at 279. Moreover, the trial court's findings as to witness credibility are entitled to particular deference due to its superior ability to evaluate the veracity of witnesses who testify before it. R.G., 217 N.J. at 552; F.M., 211 N.J. at 448; M.M., 189 N.J. at 279.

As to prong four, the mother argues that the Division failed to prove by clear and convincing evidence that termination of her parental rights would not do more harm than good. She contends that she had a loving relationship with her children, the children did not have a secure bond with their resource parent, and the only thing preventing family reunification was her lack of housing, which was caused by her poverty. We reject these contentions and affirm substantially for the reasons given by Judge Kondrup-Coyle. We add the following brief remarks.

The judge found that Dr. David Brandwein was credible. She agreed with his conclusion that the bond between the mother and the children was deteriorating because of her failure to meet their needs and her failure to be consistently present in their lives. The judge agreed with Dr. Brandwein's conclusion that the children were developing a bond with the resource parent, and he endorsed the Division's plan for the children to be placed together to achieve permanency with the resource parent.

The record supports the judge's conclusion that termination of the mother's parental rights would not do more harm than good. Dr. Brandwein's testimony supports the conclusion that the children do not have a secure parent-child bond with the mother. Additionally, the evidence shows that, at the time of trial, the mother had withdrawn from the children's lives. She was not attending visitation, she was no longer involved in mental health treatment, and she had no plan for providing for her children.

Dr. Brandwein also emphasized the children's need for permanency, which could be achieved through the Division's plan for the children to be adopted by the resource parent. At the time of trial, the groundwork for a strong bond between all four children and the resource parent had existed, and the resource parent committed to adopting them. Since their removal from the

mother in September 2015, the three older children have received therapy. In addition, Edward has worked with a mentor, and Yolanda and Ashley have received interventions addressing their educational delays.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5169-17T2