# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1165-18T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

E.N.S.,

      Defendant-Appellant/
      Cross-Respondent,

and

L.G. and O.A.,

      Defendants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.A.S.
and J.A.G., Minors,

      Respondents/Cross-Appellants.

_____

Submitted September 10, 2019 – Decided October 24, 2019

Before Judges Fisher and Accurso.

On appeal from the Superior Court of New Jersey,
Chancery Division, Family Part, Essex County,
Docket No. FG-07-0100-18.

Joseph E. Krakora, Public Defender, attorney for
appellant/cross-respondent (Robyn A. Veasey, of
counsel; Stephania Saienni-Albert, Designated
Counsel, on the briefs).

Joseph E. Krakora, Public Defender, Law Guardian,
attorney for respondents/cross-appellants (Nancy P.
Fratz, Assistant Deputy Public Defender, of counsel
and on the briefs).

Gurbir S. Grewal, Attorney General, attorney for
respondent (Jane C. Schuster, Assistant Attorney
General, of counsel; Casey Jonathan Woodruff,
Deputy Attorney General, on the brief).

PER CURIAM

Defendant E.N.S. appeals from a final judgment terminating her parental

rights to her nearly fifteen-year-old son, Jay, and thirteen-year-old son, Jim.[1]

She contends the Division of Child Protection and Permanency failed to prove

the four prongs of the best interests standard of N.J.S.A. 30:4C-15.1(a)(1) to

(4) by clear and convincing evidence. The Law Guardian cross-appeals on

---

[1] These names are fictitious. We employ them to protect the children's
privacy.

behalf of the boys. Although conceding the Division met the first three prongs of the best interests standard, she contends the Division's plan for these boys, select home adoption, is a "gamble." The Law Guardian contends termination of parental rights will do these children more harm than good because it risks severing the connection between the brothers as well as their connection with their maternal relatives.

Judge Paganelli presided over a three-day trial in this case. He considered the Law Guardian's arguments and the boys' desire to remain together and with their grandmother, who refused both adoption and kinship legal guardianship. He nevertheless concluded that continuing their relationship with their mother, whom he found endangered their lives and with whom reunification, as the Law Guardian concedes, was not possible, was not in their best interests. The judge relied on the "compelling" testimony of the Division's adoption supervisor that Jay and Jim could be provided with adoptive placements. He also relied on the Division's acknowledgment that the boys, given their ages, would have a say in their placements and clearly wanted to be placed together, which the Division considered optimal.

Having reviewed the record, we find no basis to second-guess the judge's factual findings in this difficult case. Accordingly, we affirm substantially for

A-1165-18T3

the reasons expressed by Judge Paganelli in his thorough and thoughtful written opinion of October 24, 2018. We add only that in trying to effect a permanent placement for these boys, the Division must use its best efforts to avoid the further harm they would suffer by disruption of the connection between them, one obviously important to both brothers. See In re D.C., 203 N.J. 545, 566 (2010).

The facts are fully set forth in Judge Paganelli's detailed sixty-page opinion, and we need not repeat them here. Suffice it to say the boys were first removed from their mother's care in 2007, after the death of their brother, the second infant to die in defendant's care that year.[2] Although doctors initially believed the baby died from the same sort of respiratory problems that claimed his brother, an autopsy revealed a skull fracture and rib fractures of varying ages. The death was deemed suspicious and defendant substantiated for neglect.

Jay and Jim were returned to their mother in 2010, but the referrals continued. In 2014 defendant pinned a note to Jim's shirt before school stating, "I lie, am disrespectful, steal and pee in the bed." When defendant's

---

[2] In January 2007, Jim's twin brother, then three months old and suffering from "severe respiratory problems," died after the child was put to bed on his stomach in a "portable baby carrier."

stepfather attempted to prevent her from sending Jim to school with the note pinned to his shirt, defendant choked him. The Division offered defendant services, including parenting skills classes, which she declined.

The incident precipitating this action occurred in 2017, when Jim found a gun that defendant was holding for her boyfriend in the room she shared with the children in her mother's home. Jim, then ten years old, claimed the boyfriend punched him in the face and hit him with a belt in front of defendant for refusing to lie about the gun.

A Division worker saw the boy's bruised and bloodied face in the emergency room where he had been taken by his grandmother. Interviewed at the police station, defendant admitted holding the gun but denied her boyfriend had hit Jim. Defendant, who the worker reported was "very aggressive and combative," complained that Jim was the source of her continued involvement with the Division, and that "she [didn't] want to deal with [him] or his brother [Jay] anymore," saying "fuck these kids — y'all can have them."

Following their removal, the boys' maternal grandmother assumed their care. She eventually, however, found Jim too difficult and disruptive to manage and asked the Division to remove him. Jim was placed in a residential care facility. After he was approved for step-down care, his grandmother

refused to have him live with her, and Jim was placed in a therapeutic resource home.[3] Although Jay continued in her care through trial, she has steadfastly declined either kinship legal guardianship or adoption of either boy.

The Division's experts diagnosed defendant with antisocial personality disorder, opining she sees others as objects to be used for her own purposes and not as individuals with their own perspectives. Dr. Sostre, a psychiatrist, chronicled defendant's mental health history, which included a psychiatric hospitalization and medication as a teenager, followed by two years of residential treatment, but no treatment as an adult.

Because she had not observed defendant with her sons, Dr. Sostre declined to provide an opinion on defendant's ability to parent them. She did, however, note that antisocial personality disorder is not treatable. She further explained that defendant's lack of empathy, characteristic of those with antisocial personality disorder, would make it difficult for her to understand how her actions might cause her children to feel, for example, that her failure to visit would cause them pain. Although not optimistic about her prognosis, Dr. Sostre recommended individual psychotherapy "to at least give [defendant]

---

[3] The Law Guardian recently advised that resource parent has since requested Jim's removal from her home, and he has been placed in another resource home.

A-1165-18T3

a shot" at "increasing her ability to empathize or recognize the needs of her children."

The Division's psychologist, Dr. Kirschner, agreed with Dr. Sostre's diagnosis. His own testing revealed defendant's lack of empathy, and her scores were among the most extreme he had ever seen on the scales measuring belief in corporal punishment and in restricting power and independence in children. Dr. Kirschner testified defendant's scores made clear "there's really only one tool in [defendant's] toolbox," corporal punishment.

Dr. Kirschner testified that defendant lacked the ability to adequately meet the needs of her sons for safety and protection, as well as for nurturance and stability and could not provide them guidance and judgment. In his view, the likelihood of that changing in the foreseeable future "was generally poor." As a result of his bonding evaluation, Dr. Kirschner learned that Jay was "neutral" as to reunification and would prefer living with his grandmother, with whom he felt safer and who had provided him a more stable home than he had with his mother. Jim, who was living in a residential treatment facility at the time of the evaluation, wanted to be with his brother.

Dr. Kirschner acknowledged the children had a bond with their mother, but claimed that over the course of time, defendant had left them "with

A-1165-18T3

questions as to whether they can trust her to be available to them," resulting in an insecure attachment. Although noting it was "possible that termination of [defendant's] parental rights could lead to these children experiencing severe and enduring harm if they were not to . . . forge a relationship with another person . . . that was able to . . . make a commitment to them," Dr. Kirschner testified he could not in good faith recommend maintaining the status quo because of the lack of "any real prospects for reunification." In Dr. Kirschner's view, "[w]hile [termination of parental rights] through select home adoption understandably creates an aspect of uncertainty and arguably could create harm for these children," it also provides "the opportunity for potentially being in a situation [for them] to become adopted."

The Division presented the testimony of the adoption worker assigned to the family and the adoption supervisor responsible for overseeing the process. The judge found both to be credible witnesses who provided detailed and informative testimony. Both testified that neither the boys' ages nor Jim's behavior problems made adoption unlikely.

The adoption worker freely acknowledged that Jay had expressed an unwillingness to be adopted by anyone other than his grandmother or his

godmother[4] and planned to "wait out" the Division until he was sixteen and eligible for independent living. The worker testified Jim only wants to be adopted if he and Jay are adopted together. The worker acknowledged the close ties the boys have to their mother's extended family. She testified the Division "can't force [the boys] to be adopted." Instead, Division staff and therapists would work with them to see the potential adoption provides. The worker also testified the Division would continue to urge the grandmother to reconsider her stance on adoption[5] and to explore other relatives who might be willing to adopt the boys. She acknowledged in response to questions from the court that the Division's plan for select home adoption could result in the children being placed separately.

The adoption supervisor explained the adoption process and that the boys, based on their ages, would be involved all along the way. She related examples of how the Division has worked with other teenagers unwilling to be adopted to see that workers "can help [them] be at a place where [they're]

---

[4] The Division evaluated Jay's godmother for placement and ruled her out because she lacked adequate space for another child.

[5] The worker testified the grandmother's refusal to adopt her grandsons stemmed from her belief that doing so "would just cause more conflict" with defendant.

going to be stable and [they] can be a part of this." The supervisor acknowledged the difficulties posed by the children's ages, their desire to remain together and Jim's behavioral issues, especially in light of defendant's diagnosis, but remained steadfast that other children with more difficulties have been successfully adopted. She testified that Jim would remain with his grandmother throughout the process unless she was unwilling to continue to care for him.

Defendant testified in her own behalf. She admitted she stopped visiting her sons, first because she was angry and upset over their removal and later because work interfered, but insisted she saw Jay regularly at her mother's house. She also admitted she refused to engage in the therapy recommended by Dr. Sostre because she had already completed a course of therapy and "got no recognition for that." Although she acknowledged the Division had "impressed upon [her] the need to get housing" since the day the boys were removed, defendant admitted the room she was renting would not be a suitable place for her sons to live.

Based on his detailed rendition of the facts adduced at trial and his assessments of the credibility of the witnesses who testified, Judge Paganelli found the Division established all four prongs of the best interests standard by

clear and convincing evidence. He found defendant had endangered her children by their removal following the suspicious death of their sibling, her admitted regular use of corporal punishment, her failure to provide them appropriate housing and working utilities, the physical confrontation with her stepfather when she tried to embarrass Jim at school over his bedwetting, and by bringing a gun into her home, which Jim found, leading to another removal. The judge also found the boys' safety, health and development would continue to be endangered by their relationship with their mother based on her lack of insight into their needs, her antisocial personality disorder and her continued failure to maintain adequate housing.

Judge Paganelli also found defendant was unwilling or unable to eliminate the harm to Jay and Jim. Given defendant's adamant refusal to engage in therapy and her failure to participate in therapeutic visitation, both geared to assist her in understanding and meeting her sons' needs, the judge found her trial testimony that she would now do anything to regain custody of her children to lack credibility.

Cataloging the many services the Division provided defendant, the judge concluded the Division had easily met its obligation to provide her the services she needed to correct the conditions that led to the children's placement. The

11

judge also considered, and rejected, alternatives to termination, including relative placement, long-term specialized care, independent living and kinship legal guardianship with the children's maternal grandmother.

Finally, the judge concluded, based on the expert testimony, that termination of defendant's parental rights would not do more harm than good. He accepted Dr. Kirschner's testimony, unrebutted on this record, that defendant is unable to meet her sons' developmental needs and continues to pose a heightened risk of harm to them in the event of reunification.

The judge was clearly mindful of the Supreme Court's acknowledgment of the "unfortunate truth that not all children, who are 'freed' from their legal relationship with their parents, find the stable and permanent situation that is desired even though this is the implicit promise made by the state when it seeks to terminate the parent-child relationship," N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 611 (1986) (quoting In re Angelia P., 623 P.2d 198, 210 (Cal. 1981) (Bird, C.J., concurring and dissenting)), and that "[a] court should hesitate to terminate parental rights in the absence of a permanent plan that will satisfy the child's needs." N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 593 (App. Div. 1996). He relied, however, on the "credible and persuasive" testimony of the Division's adoption supervisor, who

12

"testified confidently, although not with certainty," that Jay and Jim "could be provided with adoptive placements," and that the Division has secured adoptive homes for other children initially hesitant or opposed to adoption.

The judge rejected defendant's and the Law Guardian's assertion that the case bore a close resemblance to the facts in New Jersey Division of Youth & Family Services v. E.P., 196 N.J. 88 (2008), taking pains to distinguish the reaction of the children to the prospect of not being reunited with their mother, the stability of their interim placements and the prospects for adoption in this case from the very different facts in E.P. Instead, he concluded the greater harm would likely result from continuing Jay and Jim's relationship with defendant than by the uncertainty posed by the Division's plan of select home adoption based on the facts adduced at trial.

Our review of a trial court's decision to terminate parental rights is limited. N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448-49 (2012). We generally "defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." E.P., 196 N.J. at 104 (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 293 (2007)).

13

Having reviewed this record, we are convinced Judge Paganelli's findings have ample support in the trial testimony. Defendant's arguments that there was insufficient evidence to conclude that her sons' safety, health or development had been or would continue to be harmed by their relationship with her; that she was unwilling or unable to eliminate the harm or provide them a safe and stable home; and that the Division had made reasonable efforts at reunification are without sufficient merit to warrant discussion here. See R. 2:11-3(e)(1)(E).

As the Law Guardian acknowledges, this case turned on the fourth prong. But this case is not E.P., which the Court characterized as one in which "a parent-child relationship that continued to provide emotional sustenance to the child" was "severed based on the unlikely promise of a permanent adoptive home." E.P., 196 N.J. at 114. Neither boy here is sustained emotionally by his relationship with defendant. Dr. Kirschner testified that Jim told him he would feel "neutral" to reunification with his mother. The doctor explained that "[even] in instances where parents have done horrific things to a child, a lot of times the child says I want to be reunified with my parent" because they have a desire to maintain that connection. Dr. Kirschner's view was that "[n]eutral is

14

as noncommittal I think as you can get." Jim's emotional connection is with his brother, not his mother.

In weighing the evidence on the fourth prong, the court was balancing what Dr. Kirschner testified was the boys' insecure attachment to their mother against the opportunity for permanency presented by the Division's adoption workers who testified Jay and Jim were still adoptable and capable of permanent placement. We do not underestimate the difficulty of the decision facing a trial court weighing the evidence on the fourth prong when there is no adoptive family waiting for the child. But as the Court has acknowledged, "there will be circumstances when the termination of parental rights must precede the permanency plan." A.W., 103 N.J. at 611. As the Court explained, "given the need for continuity, the child's sense of time, and the limits of our ability to make long-term predictions, [the best interests of the child] are more realistically expressed as the least harmful or least detrimental alternative." Id. at 616 (quoting Albert J. Solnit, Psychological Dimensions in Child Placement Conflicts, 12 N.Y.U. Rev. L. & Soc. Change 495, 499 (1983-84)).

Judge Paganelli capably and conscientiously weighed the evidence in the record in determining that the termination of defendant's parental rights to Jay

and Jim will not do them more harm than good.  Because there is sufficient support in the record for the court's conclusion that the Division proved all four prongs of the best interests standard by clear and convincing evidence, we affirm the termination of defendant's parental rights, substantially for the reasons expressed by Judge Paganelli in his thorough and thoughtful written opinion.

We add only that in trying to effect a permanent placement for these boys, the Division must use its best efforts to avoid the further harm they would suffer by disruption of the connection between them, one obviously important to both brothers.  See In re D.C., 203 N.J. at 566.  The Law Guardian is free to make an application to the trial court for entry of an order to ensure the continuing relationship between Jay and Jim and continued judicial oversight pending the boys' eventual adoption.  See In re Guardianship of Jordan, 336 N.J. Super. 270, 276 (App. Div. 2001) (affirming guardianship order separating siblings but remanding to the trial judge to "do whatever he can by way of judicial supervision and order to nurture this relationship" between the siblings).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1165-18T3