# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5016-18

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

K.I.B.,

     Defendant,

and

E.W.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.Q.B.
and A.A.I.B., minors.

_____

Submitted October 28, 2020 – Decided March 1, 2021

Before Judges Vernoia and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0016-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Lauren Derasmo, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Merav Lichtenstein, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor A.Q.B. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Lynn B. Norcia, Designated Counsel, on the brief).

PER CURIAM

Defendant E.W.[1] (defendant) appeals from a Family Part judgment terminating his parental rights to the son, A.Q.B. (Alan), he shares with defendant K.I.B. (Kara). Defendant contends we should reverse the judgment because the court erred by finding the Division of Child Protection and Permanency (the Division) presented clear and convincing evidence satisfying

---

[1] We employ initials and pseudonyms to protect the privacy of the parties and for ease of reference. R. 1:38-3(d)(12).

each of the prongs of the best-interests-of-the-child standard embodied in N.J.S.A. 30:4C-15.1(a).  Unconvinced, we affirm.

I.

Alan was born in May 2011.  Defendant was not identified as Alan's father on the child's birth certificate.  It is unclear with whom Alan resided immediately following his birth, but there is no evidence he lived with or was cared for by defendant at that time.

In July 2014, the Division received a referral that defendant was shot while leaving a cookout with Alan in his care.  Kara was incarcerated at the time of the shooting.  During the Division's investigation of the referral, defendant reported that his mother, W.W. (Wendy), had custody of Alan.  Defendant also explained he had been incarcerated for two years, had been released "over three months ago," and was living in his mother's home.  Based on defendant's statement to the Division during its investigation of the referral, from approximately April 2012, eleven months after Alan was born, until April 2014, when Alan was almost three, defendant was incarcerated and unavailable to care for Alan.

Wendy reported she was granted custody of Alan in December 2013 and had been caring for the child prior to that time. The investigation also revealed that following his release from prison in April 2014, defendant resided in Wendy's home. During the Division caseworker's interview of Alan, the child referred to defendant as "daddy" and explained that defendant and Wendy made food for him, and defendant "help[ed] him get dressed after he bathe[d]." The Division determined the allegations of abuse and neglect against defendant arising from the shooting incident were not established.

Approximately one year after the shooting incident, defendant was arrested in New York on a robbery charge. He was later convicted and sentenced to prison. Since his July 2015 arrest on the robbery charge, defendant has been incarcerated in various New York jails and correctional institutions and has been unavailable to care for or parent Alan. At the time of the June 2019 guardianship trial, it was anticipated defendant would be released from custody in January 2020.[2]

---

[2] In her brief on appeal, the Law Guardian reports defendant was not released in January 2020 and that defendant's conditional release date was August 23, 2020 and maximum release date was July 5, 2021. We do not rely on this information, which was not before the trial court, in our consideration of defendant's challenge to the guardianship order.

4

The Division next became involved with Alan in July 2016 when it received a referral that Kara had been arrested for shoplifting.[3] Kara was incarcerated for a few days as a result of the arrest, and the Division determined Alan was with Kara's sister, with whom Kara and Alan were living at that time. The investigation revealed Kara had a court order showing she "just recently" had sole custody of Alan returned to her. The Division determined the referral for abuse or neglect was not established, and Alan remained in Kara's custody.

A "family friend" of Kara's, D.H. (Dana), testified that in the months prior to October 2016, Kara left Alan in her home. Kara was incarcerated during that time. Following her release from incarceration in October 2016, Kara took Alan from Dana's care and returned with Alan to live at her sister's home. Just over a week later, the Division received a referral that Alan had missed nine days of school. During the Division's investigation, Kara reported she had transferred Alan to a school closer to her sister's home, and the Division determined the abuse or neglect referral was not established.

Dana testified Kara gave birth to a daughter, A.A.I.B. (Alice), on November 20, 2016, and, two weeks later, Kara returned to Dana's home with Alan and Alice. Since that time, with the exception of a one-month period in

---

[3] Kara advised she was charged with shoplifting and resisting arrest.

2017 when the children were removed while the Division qualified Dana as a resource parent, Dana has cared for, and provided a home for, Alan and Alice.

In January 2017, the Division discovered Kara was no longer living with her sister and that the children were living with Dana and her mother, C.H. (Chris). The Division spoke with Alan, who reported that he enjoyed living with Dana and Chris, and that he felt safe with them. During a February 1, 2017 Division visit to Dana's home, Kara said she wanted to share joint custody of the children with Dana.

On March 2, 2017, the Division determined that Dana's home was clean and well-kept and Alan was happy living there. Four days later, Dana advised the Division that Alan "pok[ed] himself in the stomach with a . . . pencil" at school, "said he wanted to kill himself," and "told staff members that he would defecate on himself." He was not permitted to return to school until he received a "psychiatric assessment."

The Division was unable to locate Kara to obtain permission for the assessment.[4] On March 8, 2017, the Division conducted a Dodd removal of the

---

[4] The Division later learned Kara was incarcerated at the time. On March 8, 2017, Kara told the Division she was incarcerated from February 28, 2017, through March 7, 2017, for driving under the influence and possession of marijuana.

children from Dana's home because it did not meet the licensing standards for a resource home.[5]  The home had insufficient bedroom space and Dana's brother, who had a criminal conviction, resided there.

On March 8, 2017, the court entered an order granting the Division care, custody, and supervision of Alan and Alice.  On that date, Kara informed the Division she wanted the children placed together, and that Wendy was willing to take both children.  The order reflects that defendant's whereabouts were then unknown to the Division.

At a March 22, 2017 hearing, the court continued the care, custody, and supervision of the children with the Division.  The court's order reflects that defendant was not provided notice of the hearing.[6]  The court's order granted Kara and defendant supervised visitation with Alan.

On April 10, 2017, the Division returned the children to Dana's care after her home became eligible for licensing as a resource home.  Two days later, the Division noted defendant was "incarcerated at Rikers Island."  That same day,

---

[5]  A "Dodd removal" is an emergency removal of a child from the custody of a parent without a court order, as authorized by N.J.S.A. 9:6-8.29 of the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82.

[6]  The record also does not disclose if the Division knew of defendant's whereabouts at that time.

Wendy "informed the Division that she [was] interested in caring for her grandson [Alan] and [was] also willing to care for [Alice]." The Division caseworker noted that Wendy would be assessed "as a possible resource for [the] children."

The court held proceedings on April 27, June 28, and July 31, 2017, but defendant was not noticed of those hearing dates, nor represented by counsel. On July 31, 2017, the court required that defendant be served and produced for the next hearing. In August 2017, the Division noted defendant's transfer to a correctional facility in Coxsackie, NY, and stated it would "determine if [defendant could] be serviced in . . . [his] facility as well as if [he had] an ability to plan for [Alan] at [that] time."

The Division did not serve defendant with a copy of its complaint or contact him concerning an October 30, 2017 hearing. In the court's order of that date, it again required that defendant be served. At the next hearing on December 5, 2017, defendant first appeared via telephone with counsel. Defendant thereafter appeared telephonically at all court proceedings, except on a number of occasions when telephone connections with the correctional facility were not possible or defendant declined to appear. In those instances,

defendant's attorney waived defendant's right to be present. Defendant appeared telephonically on each day of the guardianship trial.

The Division sent defendant letters on January 31, March 28, and May 10, 2018, providing its contact information, notifying defendant of upcoming court dates, and advising that Alan was diagnosed with attention-deficit/hyperactivity-disorder and oppositional defiant disorder and was taken for "an assessment [on April 11, 2018] to determine if there [was] a need for psychotropic medication." The Division also provided defendant with copies of the letter from the hospital and an assessment report concerning Alan.

On June 4, 2018, the Division changed its goal "from [r]eunification to [a]doption." The court's permanency order noted that, at that time, defendant "remain[ed] incarcerated in [New York] . . . and [was] not offering himself as a plan" for Alan. At a June 18, 2018 hearing, the court ordered that Kara was "permitted to have . . . visitation with her . . . children . . . once a month while incarcerated." Defendant argues that "[n]o justification . . . [was given] for why this was not ordered for [him]." However, by this time, defendant had been relocated to a correctional facility in Altona, New York, which was "five-and-a-half hours away" from Alan's residence.

The Division filed a guardianship complaint on July 16, 2018, seeking to terminate Kara's parental rights to Alan and Alice, and defendant's parental rights to Alan.[7] Defendant was subsequently served with the complaint, and, as noted, he appeared telephonically and with counsel at all hearings in the guardianship proceeding.

During an October 18, 2018 court conference, the Division explained it did not intend to provide defendant with visitation with Alan at defendant's upstate New York prison facility because defendant had advised he would not present himself as a plan for Alan, and because he was incarcerated such a great distance away from Alan.[8] Defendant did not object. To the contrary, defendant's counsel asked if defendant wanted to address the visitation issue and, in response, defendant said he did not want to say anything about it.

A Division caseworker testified during the guardianship trial that defendant was aware of the Division's position concerning visitation, and that

---

[7] Alice's biological father was never identified.

[8] At the same hearing, defendant's counsel acknowledged that defendant did not present himself as a plan for Alan, but counsel also stated she intended to address that issue with defendant. The record shows defendant never changed his plan or indicated to the Division or court that his plan for Alan was that he would provide the child with a safe and secure home.

he did not object or request visitation. The caseworker testified that visitation was not offered to defendant at the upstate New York correctional facility because the Division did not "feel . . . it was in [Alan]'s best interest to travel . . . [ten] hours," and Alan's "hyperactivity issues" posed "safety concerns . . . when [they] transport[ed] him." The testimony was unrefuted.

Defendant first spoke directly with a Division caseworker on November 30, 2018. During that telephone call, defendant explained he had been convicted of second-degree robbery, that he had been incarcerated "[g]oing on five years," and that he had a scheduled release date fourteen months later in January 2020. The caseworker inquired about how much contact defendant had with Alan, how much of Alan's life defendant had been incarcerated, and what defendant's plan was. Defendant explained his mother Wendy "stepped in[to] the parenting role" during the first four years of Alan's life until the child went into foster care.[9] Defendant stated his plan was to surrender his parental rights to Wendy or his sister, V.W. (Verna), "ONLY," to have "his sister or mother adopt his son," and to become integrated in planning for Alan after he was released from prison.

---

[9] Defendant's statement is undermined by other evidence that Kara obtained custody of Alan from Wendy by early 2016, and Kara and Alan resided with Kara's sister during portions of 2016. Alan was not placed in foster care until the March 2017 Dodd removal.

The caseworker explained the Division's plan was for "foster home adoption." Defendant questioned how the matter could proceed to trial without any visitation or a bonding evaluation, and the caseworker responded that a bonding evaluation might "impact [Alan] negatively" because defendant "ha[d] not had visitation or any contact with his son" and had "not spent time with [his] son." Defendant told the caseworker the phone call was his first contact with the Division since the case opened, and he wanted to speak with Alan and would request phone contact at his upcoming December 20, 2018 court hearing. At the hearing, however, neither defendant nor his counsel requested phone contact with Alan. Instead, defendant's counsel explained only that defendant's "main concern" was the Division "looking into his mother . . . and sister as placement options" and that the "priority [was] making sure [Alan was] with his paternal relatives."

The Division assessed several of defendant's relatives as resource parents for Alan, including Wendy, Verna, defendant's father, E.C. (Elbert), and defendant's relatives T.G., U.J., and I.J. T.G. was ruled out due to an "active criminal charge"; U.J. and I.J. were ruled out due to lack of space in their homes; and Elbert, who had a criminal history, was ruled out due to his failure to provide required documentation. Initially, Wendy was ruled out due to a lack of

12

adequate bedroom space in her apartment, and then a second time because she had a 2008 substantiation for neglect/inadequate supervision. The Division sent rule-out letters to Wendy, Elbert, T.G., U.J. and I.J.

Verna offered herself as a placement for the children in February 2018, but requested her home not be assessed until she relocated. The Division assessed her new home on September 6 and October 4, 2018, and it "sent her a letter identifying . . . [licensing violations] with the home" that required remediation.

In March 2019, Verna again relocated, and the Division was required to restart the home assessment process. Verna subsequently "expressed that she was no longer interested" and "wanted to remove herself from the . . . process." At the guardianship trial, the Division caseworker testified that Verna said the process was "overwhelming," and Verna testified she felt like she was "being led on" and she "didn't want to keep taking [her own three children] through the process of having these different people in and out of [her] house." The Division sent Verna a rule-out letter on April 22, 2019. Neither Verna nor any of defendant's other family members who were assessed as possible placements for Alan appealed from the rule-out letters they received.

13

In March 2019, the court ordered that defendant undergo a psychological evaluation. On May 17, 2019, Dr. Barry A. Katz traveled to the upstate New York facility where defendant was incarcerated to perform the evaluation, but defendant refused to participate. Defendant told Dr. Katz "he did not want to participate . . . because he did not want anything bad to be said about his parenting." Defendant further opined that he thought he was going to lose the case, and "did not want to have [the] evaluation affect any other children he may have."

In May 2019, a paternity test for Alan was performed at defendant's request. The results confirmed defendant is Alan's biological father.

At the guardianship trial, the Division presented testimony from Dr. Mark Singer, who was qualified as an expert in psychology. The Law Guardian presented Dr. Elizabeth Smith, who was qualified as an expert in psychology and bonding. The experts conducted separate bonding evaluations with the children and Dana, and the children and Kara. The experts made similar observations of, and reached similar conclusions concerning, Alan's bond with Dana, and Alan's bond with Kara. Based on their separate and independent evaluations, each concluded Dana was Alan's psychological parent who had over many years provided the only permanent, secure, and stable home he had known.

14

They each opined that termination of Alan's relationship with Dana would cause Alan severe and enduring emotional and psychological harm, and that termination of Kara's parental rights would cause little harm because of the attenuated bond Alan shared with her. Each also noted Alan referred to Dana as "mommy," and Dr. Smith noted Alan referred to Chris as "grandma." Both doctors also noted Alan wanted to continue to live with Dana and Chris.

Dr. Smith observed Alan "has special needs . . . that will require attention and clinical and educational intervention over many years," and "[i]t [was her] opinion that [Dana] is capable of effectively addressing these needs." Dr. Singer also found Alan "clearly requires permanency" and "a high level of consistency and stability" due to his "difficulty managing his behavior." He opined that Alan has found permanency with Dana.

Dr. Singer concluded "allowing [Alan and Alice] to remain together would be of significant benefit to the[m]." He opined that "[t]he totality of the data supports [the] plan to pursue termination of parental rights so that these children may achieve permanency through adoption by their psychological parents." Dr. Smith similarly opined that it was important for Alan to continue to live with Alice because maintenance of the sibling relationship permits him "to feel that he belongs to a family."

Dr. Smith determined it is in the children's best interests to remain together, and "it [was her] clinical opinion . . . [Alan]'s best interest would be served by . . . adoption by [Dana]." Dr. Smith explained the importance of permanency for Alan because of his special needs, his history of changing placements, and his need to trust that his caregivers will consistently be there for him. She testified she did not speak with defendant because she understood he did not present himself as a plan for Alan.

At trial, the Division presented the testimony of three caseworkers, who described their interactions with Kara, Dana, defendant, and the members of defendant's family during the Division's history with Alan and Alice. The Division also presented Dana, who explained the care she has provided for the children since 2016, her agreement to let defendant's mother and sister have visitation with Alan, and her plan to allow defendant to have access to Alan. Dana testified she wants to adopt the children to provide the consistency and stability she did not believe either Kara or defendant could provide. She also testified that defendant called and spoke with Alan every four months or so.

Defendant called Verna as a witness. She testified about her efforts to get Division approval as Alan and Alice's resource parent, her frustrations with the

process, and her decision to withdraw her request that the Division consider her as a resource parent.

During the guardianship trial, the court terminated Kara's parental rights to Alice pursuant an identified voluntary surrender of those right to Dana. Following the trial, Dana adopted Alice.

On June 28, 2019, the trial court entered a judgment terminating defendant's parental rights to Alan. The court found it "clear that [defendant's presence in Alan's life] was not consistent or substantial," as defendant "has been in and out of jail for most of [Alan]'s life." The court found "[defendant's] poor judgment . . . has resulted in his inability to provide the necessary parental solicitude, nurture[,] and care over an extended period of time," which has "harmed [Alan's] . . . safety, health, and development causing further delay in permanency."

The court also determined "[defendant]'s ongoing legal troubles . . . demonstrate that he continues to exercise poor judgment indicating that he is unable to eliminate the harm." The judge found "[e]ven if [defendant] was released today, he would need to participate in services and stabilize himself, thus causing a further delay in [Alan's] permanency." The court opined

17

that "[t]o deny [Alan] . . . permanency in the hope that [defendant] may one day become a stable parent is not in [Alan's] best interests."

Additionally, the court found that "[a]lthough the Division [was] limited in the services [it could] provide . . . [it] made reasonable efforts" by "offer[ing] . . . a psychological evaluation, paternity testing[,] and updates on [Alan]'s progress." The court also noted "[defendant] did not request any services; he did not even request visitation." Further, the court discussed the myriad services provided to Kara and Alan, and the multiple assessments of defendant's relatives as potential placements for the child, and found "[t]he efforts directed at this family were tailored to the needs of [Kara], [defendant] and the children and for a prolonged period."

Finally, the court also concluded termination of defendant's rights would not do more harm than good because defendant's relationship with Alan was "not consistent or substantial"; defendant "has not engaged in any services in order to parent"; and defendant "did not present himself as a plan." The court also credited the experts' opinions that Alan "is very well[-]bonded to [his resource parent]"; he "would . . . regress behaviorally and emotionally if [he] were to lose th[is] relationship"; and "no amount . . . of therapy or intervention could mitigate the risk of [significant and enduring] harm." The court found that "in

18

light of the numerous disruptions in [Alan]'s life, his permanency is of paramount concern."

The court entered an order terminating defendant's parental rights to Alan. This appeal followed. On appeal defendant argues: (1) the Division failed to prove he harmed Alan or that he was unwilling or unable to eliminate the harm; (2) it failed to prove it provided reasonable efforts toward reunification of defendant and Alan or considered alternatives to termination; and (3) it failed to prove termination of defendant's parental rights would not do more harm than good. The Division and Alan's Law Guardian argue the court's judgment and determination are supported by sufficient credible evidence and should be affirmed.

II.

In reviewing a decision to terminate parental rights, "[t]he scope of our review of [the] . . . court's factual findings is limited." N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 476 (App. Div. 2012). "A Family Part's decision to terminate parental rights will not be disturbed when there is substantial credible evidence in the record to support the court's findings," N.J. Div. of Child Prot. & Permanency v. K.T.D., 439 N.J. Super. 363, 368 (App. Div. 2015), because the court "has the opportunity to make first-hand credibility

judgments about the witnesses . . . [and] a 'feel of the case' that can never be realized by a review of the cold record," N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 293 (2007)).  "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007)). We review the trial court's legal conclusions de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Parents have a "constitutional right 'to raise [their] child and maintain a relationship with that child, without undue interference by the state.'" N.J. Div. of Child Prot. & Permanency v. S.D., 453 N.J. Super. 511, 518 (App. Div. 2018) (quoting N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 18 (2013)). "Permanent termination of parental rights is the ultimate intrusion on th[is] right . . . ." A.L., 213 N.J. at 25.  However, this right is "not absolute," In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999), and must be balanced against "[t]he State['s] . . . basic responsibility, as parens patriae, to protect children from serious physical and psychological harm," E.P., 196 N.J. at 102.

A court may terminate parental rights when the Division proves by clear and convincing evidence the four prongs of the "best interests" standard under N.J.S.A. 30:4C-15.1(a).  The Division must prove:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his [or her] resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a); see also N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 604-11 (1986).]

These "four criteria . . . are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests."  N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 506 (2004) (quoting K.H.O., 161 N.J. at 348).

## A.

We first consider defendant's argument the Division failed to sustain its burden under the first and second prongs of the best-interests standard. "[T]he two components of the harm requirement . . . are related to one another, and evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child." In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999). Defendant argues: the Division failed to prove he has harmed Alan and the trial court "erroneously conflated [his] incarceration with harm"; the Division "did not present evidence . . . [he] will cause harm to [Alan] in the future"; and the court erred by finding he could not "eliminate the harm" to Alan.

While "incarceration alone . . . is an insufficient basis for terminating parental rights," N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 556 (2014), a parent's incarceration is "probative of whether the parent is incapable of properly caring for the child or has abandoned the child. It is, therefore, a factor that is unquestionably relevant to the determination of whether the parental relationship should be terminated," In re Adoption of Children by L.A.S., 134 N.J. 127, 136-37 (1993).

Courts must consider a defendant's "[p]erformance as a parent before incarceration, to what extent [the] child[] [was] able to rely on [the defendant] as a parent, and what effort, if any, [the defendant] has made to remain in contact with his [or her] child[] since his [or her] incarceration." R.G., 217 N.J. at 555 (quoting L.A.S., 134 N.J. at 143). "Further, the court must consider the risk posed to [the] child[] by [the parent]'s criminal disposition; what rehabilitation, if any, has been accomplished since [the parent]'s incarceration; and the bearing of those factors on the parent-child relationship." Id. at 556 (third and fourth alterations in original) (quoting L.A.S., 134 N.J. at 143-44).

Physical harm is not required under the first prong, and action or inaction on the part of the parent that causes emotional or psychological harm to the child satisfies the prong. In re Guardianship of K.L.F., 129 N.J. 32, 43-44 (1992). This includes "[a] parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time," D.M.H., 161 N.J. at 379, and a child's unfulfilled need for a permanent home, N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 591-92 (App. Div. 1996). "Courts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect" to find this prong satisfied, D.M.H., 161 N.J. at 383, as the prong "addresses the risk of

23                                                                                      A-5016-18

future harm to the child as well," N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 222 (App. Div. 2013).

The second prong is "relate[d] to parental unfitness." K.H.O., 161 N.J. at 352. "[T]he cornerstone of the inquiry is . . . whether [a defendant] can cease causing [his or her] child harm." In re Guardianship of J.C., 129 N.J. 1, 10 (1992). Where a parent is willing and able to eliminate the initial "harm facing the child" and "provide a safe and stable home for the child," N.J.S.A. 30:4C-15.1(a)(2), the second prong may still be satisfied "not on grounds of current unfitness[,] but because of potential [enduring] harm to the child based on separation from a [resource] parent with whom the child has bonded," J.C., 129 N.J. at 18; see also K.H.O., 161 N.J. at 363 (stating the second prong is met where "the child will suffer . . . from the disruption of [his or] her bond with [resource] parents"); L.J.D., 428 N.J. Super. at 494 (finding the second prong satisfied upon "unequivocal [expert] testimony" that the child's removal "from [the] resource parents would cause serious and enduring emotional harm").

Here, the court found defendant's "poor judgment . . . resulted in his inability to provide the necessary parental solicitude, nurture[,] and care over an extended period" of time, and that defendant has "harmed [Alan's] . . . safety, health[,] and development causing further delay in permanency." The court's

24

finding of harm is supported by the evidence showing defendant's poor decision making by engaging in criminal activity resulted in his absence, through incarceration, for all but a very small portion of Alan's life.  The trial court credited the unrefuted expert testimony that defendant's and Kara's absences from Alan's life caused the child to suffer from a "desperate[] need[] [of] stability," "permanency[,] and consistency."  See, e.g., L.A.S., 134 N.J. at 141 (explaining the inability of an incarcerated parent "to carry out many regular and ordinary parental duties . . . can be deleterious to the emotional and psychological condition of the children").

Indeed, defendant has been available to parent nine-year-old Alan only during the fifteen-month period between April 2014 and July 2015, and, according to defendant's statement to the Division caseworker, during that time Wendy had custody of, and cared for, Alan while defendant lived with them.[10] A child's unfulfilled need for a permanent home constitutes harm under the first prong of the best-interests standard, B.G.S., 291 N.J. Super. at 591-92, and the record supports the court's determination the Division presented clear and convincing evidence defendant had caused, and would continue to cause, Alan harm by depriving him of the permanency to which he is entitled.  Indeed, the

---

[10]  Alan was eight years old at the time of the June 2019 guardianship trial.

evidence established defendant consistently communicated that he did not intend to offer himself as a plan to provide Alan with a permanent, safe, and secure home, even after his release from incarceration.

The court also determined the Division proved that defendant posed a risk of future harm to Alan. The court's finding is supported by defendant's decision not to offer himself as a person who would provide Alan with a permanent home, as well as by the unrefuted expert testimony that Alan's loss of Dana as his caretaker and psychological parent would cause "a significant, negative reaction. . . . [that] would be . . . enduring" and would cause Alan to further "regress emotionally and behaviorally." See In re Guardianship of J.E.D., 217 N.J. Super. 1, 16 (App. Div. 1987) (finding "where the child has been in [resource parent] care and has developed a 'parent-child' relationship," the "destruction of such a relationship is itself . . . harm to the child"). The court's determination the Division sustained its burden under the first prong of the statutory standard is supported by substantial credible evidence.

The second prong may be satisfied "not on grounds of current unfitness[,] but because of potential [enduring] harm to the child based on separation from a [resource] parent with whom the child has bonded." J.C., 129 N.J. at 18; see also J.E.D., 217 N.J. Super. at 16. As noted, the Division's and Law Guardian's

experts not only found the risk of significant and enduring harm to Alan if his relationship with Dana is severed, but Dr. Smith also concluded that no "amount or kind of therapy or intervention could mitigate the risk." The evidence establishing the harm that will result from termination of Alan's relationship with Dana satisfies the second prong. J.C., 129 N.J. at 18-19; J.E.D., 217 N.J. Super. at 16.

Additionally, and as noted, the evidence shows defendant has consistently stated he does not intend to provide Alan with a permanent home. That is, defendant has no desire or plan to provide Alan with a permanent home. His consistent position has been that permanency for Alan should be provided by either Wendy or Verna. Defendant does not seek to serve as Alan's custodial parent or to assume responsibility for providing the safe, secure, and permanent home Alan deserves. Thus, by his own admissions, defendant is unwilling to address or remedy the harm caused by the lack of permanency that characterized Alan's life prior to his placement with Dana. Defendant has not, and does not, present himself as a plan to address the harm facing Alan—further delay in providing Alan with the safe and secure home and permanency Dana has provided for many years, and promises to continue to provide through adoption.

Defendant challenges the court's finding that his "ongoing legal troubles . . . demonstrate that he continues to exercise poor judgment indicating that he is unable to eliminate the harm." The court also found defendant "has not engaged in any services" and "refused to participate" in a court ordered psychological evaluation, and that "[e]ven if [defendant] was released today, he would need to participate in services and stabilize himself, thus causing a further delay in [Alan]'s permanency."

Defendant contends the court's findings are in error because he does not have any parenting deficiencies or mental health issues that render him unable to parent Alan, and he is not in need of any services to permit him to ably parent Alan and provide Alan with a safe and secure home. His self-serving, conclusory assertions ignore that he was offered a psychological examination so the nature and extent of the issues that have caused him to engage in the ongoing criminal activity that have rendered him wholly unavailable to parent Alan could be identified. He refused the examination, and the benefits it may have yielded, based solely on his concern that it might affect his entitlement to parent "other children he may have." His refusal simply confirms he is unwilling to take the steps necessary to eliminate the harm facing Alan and is unwilling to provide Alan with a safe and stable home. See N.J.S.A. 30:4C-15.1(a)(2).

28

In sum, the court's finding defendant has caused and will continue to cause Alan harm by depriving him of permanency and by severing the strong bond Alan has with his psychological parent, Dana, is amply supported by the evidence. Similarly, the court's determination defendant is unwilling and unable to remediate the harm is supported by substantial credible evidence. We discern no basis to disturb the court's findings under the first and second prongs of the best-interests standard. N.J.S.A. 30:4C-15.1(a)(1) to (2); see also K.H.O., 161 N.J. at 353-54.

B.

Defendant also contends the court erred by finding the Division sustained its burden of establishing it provided reasonable efforts to enable him to "become a functioning parent and caretaker." K.H.O., 161 N.J. at 354; see also N.J.S.A. 30:4C-15.1(a)(3) (requiring the Division to prove it made "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement . . . and the court has considered alternatives to termination of parental rights"). "Reasonable efforts" are defined as:

> attempts by an agency authorized by the [D]ivision to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure, including, but not limited to:

(1) consultation and cooperation with the parent in developing a plan for appropriate services;

(2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;

(3) informing the parent at appropriate intervals of the child's progress, development, and health; and

(4) facilitating appropriate visitation.

[N.J.S.A. 30:4C-15.1(c).]

The focus is on the Division's efforts toward "reunification of the parent with the child and assistance to the parent to correct and overcome those circumstances that necessitated the placement of the child into [resource parent] care." K.H.O., 161 N.J. at 354. However, "[t]he diligence of [the Division]'s efforts . . . is not measured by their success," but rather "against the standard of adequacy in light of all the circumstances." D.M.H., 161 N.J. at 393.

"Whether particular services are necessary in order to comply with the diligent efforts requirement must . . . be decided with reference to the circumstances of the individual case before the court, including the parent's active participation in the reunification effort." Id. at 390. "[W]here one parent has been the custodial parent and takes the primary . . . role in caring for the child[], it is reasonable for [the Division] to continue to focus its efforts of

family reunification on that custodial parent, so long as [it] does not ignore or exclude the non-custodial parent." Id. at 393.

The record shows the Division provided innumerable services to Kara, who was Alan's custodial parent when the Dodd removal occurred. As the trial court correctly noted, the Division provided Kara with "psychological and bonding evaluations, supervised visitation, parenting skills [training], individual therapy, [Center for Alcohol and Drug Services] assessment[s], substance abuse treatment, transportation assistance[,] and [Family Team Meeting]s." The Division properly "focus[ed] its [substantial] efforts of . . . reunification on th[e] custodial parent," ibid., because defendant's ongoing lengthy incarceration rendered him unavailable to parent Alan, and defendant otherwise consistently indicated he did not intend to present himself as a plan to provide Alan with a permanent home.

Any effort to provide services to defendant was also "necessarily impeded by the difficulty and possible futility of providing services to an incarcerated person." R.G., 217 N.J. at 557. The services that could be offered to defendant were further limited because defendant was incarcerated at a distant out-of-state prison. In such circumstances, "reasonable efforts may be satisfied when the Division provides services to, and seeks reunification with, the custodial parent

31

from whom the child was removed." Id. at 557-58; see N.J. Div. of Youth & Fam. Servs. v. T.S., 417 N.J. Super. 228, 242-43 (App. Div. 2010) (finding that, because a father had no relationship with his daughter prior to his incarceration, providing services to him would be futile). However, "[a]bsent an order under N.J.S.A. 30:4C-11.3, the Division may not ignore requests or avoid providing services to an incarcerated parent." R.G., 217 N.J. at 558. Again, the Division provided reasonable services by focusing its efforts on reunification of Alan with his custodial parent, Kara, while defendant served his prison sentence. The Division's focus on reunification with Kara was especially appropriate here because defendant expressed that he should not be considered as a plan to provide Alan with a permanent and secure home.

In any event, the Division provided services to defendant. It sent letters to defendant concerning the status of the proceedings and Alan's assessment at a hospital; it provided the paternity test defendant requested; and it provided a psychological evaulation in which defendant refused to participate. Defendant complains the Division did not provide visitation with Alan, but the evidence established the Division made a reasoned decision not to transport Alan on a ten-hour round-trip to visit defendant in the upstate New York correctional facilty because of the child's special needs and the safety issues they presented.

During an October 18, 2018 court hearing, the Division explained the basis for its decision not to transport Alan for visitation at the correctional facility, and, when asked by his counsel if he wished to address the issue of visitation, defendant replied that he had "nothing" to say. Defendant's failure to object during the hearing to the Division's decision not to transport Alan ten hours for visitation is consistent with defendant's position that he had no intention of providing Alan with a permanent and secure home.

Additionally, during his November 30, 2018 discussion with the caseworker, defendant said he wanted to speak with Alan over the telephone and would make that request at the next court hearing, but at the subsequent hearing neither defendant nor his attorney requested telphone contact with Alan. The record also otherwise established defendant was capable of contacting Alan by telephone; Dana testified defendant called Alan and spoke with him approximately every four months. There was no evidence defendant was prevented from having more telephone contact with Alan.

Defendant correctly notes a Division caseworker first contacted him directly on November 30, 2018, but at that time he reiterated what the court first noted in June 2018; defendant decided not to be a plan for permanency for Alan and sought only that the Division place Alan with either Wendy or Verna. <u>See</u>

N.J. Div. of Youth & Fam. Servs. v. K.L.W., 419 N.J. Super. 568, 580 (App. Div. 2011) (stating the Division may not "embark on a course set for termination of parental rights and adoption by a [resource] parent without at least first exploring available relative placements").  The Division provided reasonable services to effectuate defendant's plan for Alan—placement of the child with either Wendy or Verna.  See, e.g., ibid.; K.H.O., 161 N.J. at 354 (holding the Division considered reasonable alternatives where it attempted to find relatives to care for the child).

The  Division separately considered both Wendy and Verna twice as possible placements for Alan.  Wendy was ruled out because she had previously been substantiated for neglect and inadequate supervision by the Division.  She had appealed the substantiation finding, and it was affirmed.  Verna was ruled out because she withdrew her request to be considered as a placement for Alan.  Wendy and Verna received rule-out letters, and neither appealed from the Division's determinations.

Defendant's claim the Divison did not provide the reasonable services required to assist him in "correct[ing] the circumstances which led to" Alan's placement, N.J.S.A. 30:4C-15.1(a)(3), is further undermined by his contention that he does not require any services.  Defendant's counsel argued in summation,

and defendant contends on appeal, that the record is bereft of evidence he requires services to ensure his ability to prevent further harm to Alan. He inconsistently argues, however, that the Division failed to provide him with the reasonable services required under N.J.S.A. 30:4C-15.1(a)(3). In other words, defendant illogically argues he does not require any services and, at the same time, he contends the Division failed to provide the services he required.

The court found "[defendant] has been incarcerated throughout the entirety of the protective services and guardianship litigations in . . . facilit[ies] in upstate New York," and it determined "the Division made reasonable efforts, despite [defendant] not presenting himself as a plan for [Alan] and [defendant's] incarceration," by "offer[ing defendant] a psychological evaluation, paternity testing[,] and updates on [Alan]'s progress." "The court note[d] that the services were limited," but "reasonable in light of [defendant]'s circumstances." The court also stated "[defendant] did not request any services; he did not even request visitation."

We are convinced the record supports the court's determination the Division provided "reasonable [services] in light of [defendant]'s circumstances." See D.M.H., 161 N.J. at 393. We reject defendant's claim that the court's finding defendant failed to request services improperly shifted the

35                                                                         A-5016-18

burden on the third prong to him.  The court did not conclude, as defendant inaccurately claims, that the Division satisfied its burden by demonstrating defendant failed to request services.

In its consideration of the "adequacy" of the services provided, ibid., the court properly assessed if defendant "active[ly] participat[ed] in the reunification effort," id. at 390.  The Division did not "ignore requests or avoid providing services to" defendant.  R.G., 217 N.J. at 558.  Defendant did not request any services.  For example, defendant did not request contact or visitation with his son throughout the litigation, even after indicating to the caseworker that he would do so at the next hearing.  Defendant did not request any services after receiving the Division's contact information, notice of its custody of Alan, notice of Alan's special needs issues, or after speaking with the caseworker on the phone.  Defendant also did not participate in any services on his own, and he refused a court-ordered psychological evaluation.  Clearly, defendant did not "active[ly] participat[e] in the reunification effort," D.M.H., 161 N.J. at 390, nor display any "inclination" to participate in services, H.R., 431 N.J. Super. at 225.  To the contrary, defendant consistently asserted that he did not represent a permanency plan, and he acted throughout the process in accordance with that intention.

Defendant also claims the court erred because the Court's decision in N.J. Div. of Child Prot. & Permanency v. K.N., 223 N.J. 530, 534 (2015), permitted the trial court to "order that placement be with an unpaid relative even in the face of a [Division] disqualification." We do not consider the argument because it was not made before the trial court, and, as a result, the court, the Division, and the Law Guardian were deprived of the opportunity to address it. See N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 339 (2010) (explaining "issues not raised below will ordinarily not be considered on appeal").

We also reject defendant's reliance on the Court's decision in R.G., because the defendant in that case "immediately increased his efforts and contacted [the child] to remain a part of her life" after realizing she had been removed from the mother's custody, 217 N.J. at 560, and "voluntarily participated in [multiple] classes . . . while in prison," id. at 541. Here, defendant did not increase his efforts to remain a part of Alan's life after learning of the child's removal from Dana's custody. Instead, defendant stated it was not his plan to provide permanency for Alan, and he acted accordingly.

Unlike the defendant in R.G., defendant's efforts were directed exclusively to placing Alan with either Wendy or Verna. When they were ruled out, defendant's plan for permanency was no longer feasible, and he never

37

changed his position and presented himself as a parent willing to assume the responsibility for parenting his child. The Court described the defendant in R.G. as one who "expressed a willingness to improve his parenting skills and a desire to deepen his parent-child relationship." Id. at 563. There is no evidence defendant shared a similar willingness or desire.

The Division presented clear and convincing evidence that it provided reasonable services to defendant as required by N.J.S.A. 30:4C-15.1(a)(3) based on the circumstances presented. We defer to the court's finding because it is supported by the record evidence and defendant fails to demonstrate that the finding is "so 'clearly mistaken' or 'wide of the mark' [that we] should . . . intervene." E.P., 196 N.J. at 104 (quoting G.L., 191 N.J. at 605).

C.

We are unpersuaded by defendant's argument the Division did not prove the fourth prong—that termination of defendant's parental rights will not do more harm than good. N.J.S.A. 30:4C-15.1(a)(4). The ultimate question is "whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with [defendant] than from the permanent disruption of [his] relationship with [his resource] parents." K.H.O., 161 N.J. at 355. "[T]he child's need for permanency and stability emerges as a

central factor." Id. at 357; see also N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 453-54 (2012) (holding termination of the defendant's parental rights would not do more harm than good where the child's attachment to the resource parent was stronger than the attachment to the legal parent); N.J. Div. of Child Prot. & Permanency v. P.D., 452 N.J. Super. 98, 122-23 (App. Div. 2017) (finding the fourth prong satisfied upon expert testimony that the severing of the child's relationship with the resource parent would cause "severe and enduring harm," while the child had "no bond" with the legal parent); N.J. Div. of Child Prot. & Permanency v. N.C.M., 438 N.J. Super. 356, 372-73 (App. Div. 2014) (concluding the Division satisfied the fourth prong with expert testimony that the children had developed a "secure[] attach[ment]" to their resource parent while having only an "insecure attachment" to their legal parent).

The improbability of reunification with the parent or the fact the child's bond with the resource parent(s) is stronger than with the natural parent is not enough to satisfy this prong. E.P., 196 N.J. at 108; J.C., 129 N.J. at 19. The child's relationship with the resource parent(s) must be so strong "that separating the child . . . would cause serious and enduring emotional or psychological harm." E.P., 196 N.J. at 108 (quoting J.C., 129 N.J. at 19). We also consider

"the effect of permanently terminating [the child]'s connection to his [or her] siblings." In re Guardianship of J.N.H., 172 N.J. 440, 478 (2002).

The prong is typically required to be satisfied by expert testimony based on a comparison of bonding evaluations. See N.C.M., 438 N.J. Super. at 371 (stressing the need for "well[-]qualified expert" testimony concerning bonding evaluations (quoting J.C., 129 N.J. at 19)); L.J.D., 428 N.J. Super. at 492 (making its finding based on expert testimony regarding bonding evaluations). However, expert testimony is not required in an instance involving "[a] common sense notion that [a] child will be more bonded with his [or her resource] parents than with [the] defendant." N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 182 (2010). Bonding evaluations are also not required where termination is "not predicated upon bonding, but rather reflect[s the child]'s need for permanency and [the parent]'s inability to care for [the child] in the foreseeable future." B.G.S., 291 N.J. Super. at 593.

Defendant argues the Division could not prove prong four "because it presented the court with absolutely no evidence regarding [Alan]'s relationship with [defendant]." Defendant also asserts "[t]he unrefuted testimony of [Verna] was that they had enjoyed a close relationship before [defendant]'s incarceration." However, the court took issue with Verna's credibility, finding

she "smirked when she thought her testimony was advantageous [to defendant]," and that "[i]t was clear . . . she wanted [Alan] and would do anything to achieve that goal, which did not help her credibility overall."

Since we defer to the court's "first-hand credibility judgments," E.P., 196 N.J. at 104, we are unconvinced Verna's testimony alone established a "close relationship" between defendant and Alan as a matter of fact. Verna's testimony about the purported close relationship between defendant and Alan is also undermined by the unrefuted evidence that the only time defendant may have spent with Alan was during the approximately fifteen-month period following his third birthday while Alan was in Wendy's custody. The court found defendant made virtually no efforts to remain in Alan's life after his incarceration. Defendant called Alan only three times a year, never requested contact or visitation, never contacted the Division when it sent him updates and contact information, and never made "efforts to become fit to care for [his son]." The court's finding there was "no evidence [of] . . . any ongoing relationship" between defendant and Alan is supported by the record. Indeed, other than the testimony of Verna, the record is bereft of evidence supporting the notion defendant had been involved in Alan's life other than the short period, when

Alan was three, and defendant resided with Wendy following his April 2014 release from incarceration.

We are not persuaded by defendant's claim the Division did not satisfy the fourth prong because it did not proffer any "expert testimony . . . regarding the bond between [defendant and his son]." Although bonding evaluations are generally needed prior to termination of parental rights, N.J. Div. of Youth & Fam. Servs. v. A.R., 405 N.J. Super. 418, 436-37 (App. Div. 2009), they are not required where termination "[is] not predicated upon bonding, but rather reflect[s the child]'s need for permanency and [the parent]'s inability to care for [the child] in the foreseeable future," B.G.S., 291 N.J. Super. at 593. That is the case here.

The court predicated its termination of defendant's parental rights upon Alan's need for permanency and defendant's inability to care for him in the foreseeable future. Moreover, as noted, defendant consistently indicated he does not intend to provide a permanent and secure home for Alan even after he is released from incarceration. Drs. Singer and Smith testified Alan "clearly requires permanency and consistency," and is in desperate need of stability. Under those circumstances, a bonding evaluation was not required. The record supports the court's determinations that Alan needs permanency and will suffer

severe harm without it, and defendant is wholly unable to satisfy that need in the foreseeable future. See ibid.

As the court correctly found, uncontested expert testimony established "[Alan] is very well[-]bonded to [his resource parents]," and severing that relationship would cause Alan "severe and lasting harm" and would cause him to further "regress emotionally and behaviorally." The unrefuted expert testimony further established it is in Alan's best interests to remain with his sister, and the experts explained termination of defendant's rights enables Alan to finally "achieve permanency through adoption by [his] psychological parents," to whom he is "secure[ly] attach[ed]."

Because the court based its termination of defendant's rights on Alan's "need for permanency and [defendant]'s inability to care for [Alan] in the foreseeable future," ibid., and the uncontested evidence establishes that termination of Alan's relationship with his resource parents and sister would cause "severe and lasting harm," the court's determination the Division satisfied the fourth prong is amply supported by the record. See K.H.O, 161 N.J. at 355-57; F.M., 211 N.J. at 453-54; P.D., 452 N.J. Super. at 121-22.

To the extent we have not addressed any of defendant's remaining arguments, they are without sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5016-18