# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1026-21

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

L.G.,

      Defendant-Appellant,

and

B.T.,
      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
N.G., a minor.

_____

Argued September 28, 2022 – Decided October 26, 2022

Before Judges Messano and Gummer.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FG-09-0128-21.

Victor E. Ramos, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Victor E. Ramos, of counsel and on the briefs).

John J. Lafferty, IV, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Acting Attorney General, attorney; Donna Arons, Assistant Attorney General, of counsel; John J. Lafferty, IV, on the brief).

Melissa R. Vance, Assistant Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, of counsel and on the brief).

PER CURIAM

Defendant L.G. (Lucy) appeals from the Family Part's November 15, 2021 judgment terminating her parental rights to her biological daughter N.G. (Nina).[1] On appeal, Lucy argues the trial court erred in finding the Division of Child Protection and Permanency (the Division) had proven each prong of the statutory best-interests-of-the-child test, N.J.S.A. 30:4C-15.1(a), by clear and

---

[1] We refer to the parties and the child involved in this case using either initials or pseudonyms to protect their privacy and the confidentiality of these proceedings. R. 1:38-3(d)(12). The trial court dismissed co-defendant B.T. from the case after it determined he was not Nina's biological father.

A-1026-21

convincing evidence. Lucy also asserts she was deprived of effective assistance of counsel based on her lawyer's alleged failure to address the effect of recent legislative changes. The Division and Nina's law guardian contend the judgment is supported by substantial, credible evidence in the record and that Lucy's ineffective-assistance argument is based on a misinterpretation of recent statutory amendments. Having considered the arguments in light of the record and applicable legal standards, we affirm.

I.

Nina was born in June 2018. The day after Lucy gave birth to Nina, a hospital social worker contacted the Division, claiming Lucy had tested positive for phencyclidine (PCP) when she was admitted.

A Division caseworker interviewed Lucy at the hospital. When asked about substance abuse, Lucy said she had smoked marijuana at the beginning of the pregnancy because she was not certain she was going to continue the pregnancy and later in the pregnancy to relieve stress caused by her boyfriend's arrest. Lucy denied using marijuana in the last two months and denied using PCP, asserting the marijuana she previously had used might have been laced with PCP.

Lucy resided with her maternal grandparents. After Lucy was discharged from the hospital, the Division caseworker met with Lucy and her grandfather to put in place a "safety plan." As part of the safety plan, Lucy's grandfather would not permit Lucy to have unsupervised contact with Nina. In a subsequent visit, Lucy told the Division caseworker the reason she was testing positive was that she had been around people who smoke.

After completing a drug-and-alcohol evaluation in July 2018, Lucy began an outpatient substance-abuse treatment program. During an August meeting with the caseworker, Lucy denied she was still using and stated she had last used in June. Lucy successfully completed the substance-abuse treatment program and was discharged from the program in January 2019. The Division closed its case in March 2019.

On December 23, 2019, Lucy's mother contacted the Division and alleged Lucy had been using PCP while Nina was in her care and custody. A Division caseworker found Nina in Lucy's mother's care. The Division completed an intake family agreement in which Lucy's mother was not permitted to allow Lucy to have unsupervised contact with Nina. Lucy did not make herself available for a meeting with the Division until January 15, 2020.

On February 12, 2020, Lucy completed a urine screen and another drug and alcohol evaluation. The urine-screen results later showed Lucy's sample was positive for PCP. On March 5, 2020, the Division removed Nina from Lucy's custody because a caseworker visiting Lucy believed Lucy displayed several symptoms of being under the influence of a controlled substance. Lucy began the encounter by "shouting erratically" and telling the caseworker to "get the fuck out." When asked if she was feeling well, Lucy responded, "shut the fuck up and get out of my house." When the caseworker tried to engage with Lucy, Lucy ultimately handed Nina to the caseworker and told her to take her. When the caseworker asked Lucy if she was willing to pack a bag for Nina, Lucy packed a plastic bag with dish detergent, sandals, lotion, one diaper, and eight packs of hair pins. The Division placed Nina with her maternal aunt, S.G. (Sue). Nina has lived with Sue since then.

The Division questioned Lucy's ability to parent based on concerns about her on-going substance-abuse and mental-health issues. On March 9, 2020, the court determined the removal of Nina from Lucy's home was "required due to imminent danger to [her] life, safety or health" and placed Nina in the custody of the Division. The court ordered Lucy to participate in a substance-abuse assessment and to submit to random drug tests.

Lucy subsequently participated in an out-patient substance abuse program, which she completed in August 2020. After she completed that program, the court ordered Lucy to participate in recommended after-treatment care, to attend therapy counseling sessions, and to submit to random drug and alcohol screenings. The court directed that Lucy "have limited incremental unsupervised visitation" with Nina. Lucy underwent neuropsychological and psychiatric evaluations. The Division referred Lucy to Family Connections so she could receive therapy and services in its HomeSafe Program. The Division referred her to the Youth Development Center (YDC) for psychiatric services and counseling, with the primary goal of "learn[ing] to self-monitor and regulate PCP use while reducing denial/minimization/ justification."

Lucy failed to attend two scheduled substance-abuse assessments in December 2020.

On March 2, 2021, the Division received a call from a hospital advising that Lucy had given birth prematurely to a child who had died soon after being born. The next day, Lucy told a Division caseworker she had recently relapsed, smoking PCP and marijuana and taking an unprescribed muscle relaxer just days before giving birth. She told the caseworker she had had a lot on her mind and so decided to smoke PCP.

On March 24, 2021, the Division filed a guardianship complaint, seeking to terminate Lucy's parental rights to Nina.

Lucy failed to attend a substance-abuse assessment on April 1, 2021. Lucy was admitted into another substance-abuse treatment program in May 2021. After missing every individual session and attending only one group session, Lucy was discharged from the program in June for being non-compliant. She was discharged from the YDC therapy program in July due to non-compliance. The Division caseworker referred Lucy for new substance-abuse assessments in July and August, but Lucy failed to attend them. A July 15, 2021 urine screen taken of Lucy was negative for all substances, but in August, Lucy missed appointments for a hair-follicle test. Except for one telephone call, the Division's efforts to contact Lucy after those missed appointments and before the guardianship trial were unsuccessful.

On May 13, 2021, psychologist Gerard Figurelli performed a psychological evaluation and parenting assessment of Lucy. Lucy told Dr. Figurelli she had experienced depression and anxiety in the past and recently had been having nightmares. Lucy's responses to "self[-]report measures" indicated she was not "experienc[ing] clinically significant symptoms of a diagnosable psychiatric illness or clinical syndrome that requires formal mental

7

health treatment." Dr. Figurelli described Lucy as being "at moderate risk of experiencing emotional problems."

Lucy told Dr. Figurelli she had first used PCP during her early thirties and had last used it approximately one month ago but denied any history of regular PCP use. When asked why she smoked PCP, she told Dr. Figurelli she smoked it when she "really felt down." She admitted to "using drugs to numb the pain." She told him she participated in therapy "because of the trauma" she had had "with the drug use." When he asked her about her understanding as to why her mother had contacted the Division, Lucy stated her mother suspected she was using drugs. When Dr. Figurelli asked if she had been using drugs, Lucy denied using drugs but admitted "I was drinking." When he asked her why she had relapsed into drug use after completing treatment, Lucy explained that she found it hard not to have her daughter and to have had "a lot of death in the family." She attributed the Division's involvement in her life to her alcohol and marijuana use. Dr. Figurelli administered several substance-use tests and made the following conclusions regarding Lucy:

> (1) she has a history of "self-medicating" use of marijuana and PCP; (2) she has participated in substance abuse treatment with subsequent relapse into substance using behavior in response to psychosocial stress; (3) she has a history of denying and minimizing her substance abuse problem, and appeared to be

8

minimizing her history of substance [abuse] at the time of this evaluation as well; (4) she requires participation in intensive treatment with a substance abuse service provider that works with individuals with co-occurring psychiatric illness and substance use disorders; ([5]) [she] could benefit from the support provided by participation in the 12-Step self-help substance abuse recovery groups; and ([6]) her self-report of her drug abuse abstinence can be ascertained via formal testing as long as her family case remains open with the Division.

Dr. Figurelli concluded Lucy's "history of problems with substance abuse and her emotional difficulties have, at times, adversely impacted her parenting capacity and parenting decision-making" and that she lacked "the capacity to parent in a consistently safe and stable manner." He advised that Lucy "need[ed] to participate in and demonstrate a sustained benefit from services intended to address her substance abuse problems and her mental health issues" and "should undergo an updated neuropsychological evaluation to assess her capacity for engaging in consistently adequate decision-making going forward."

On August 10, 2021, Dr. Figurelli conducted a bonding assessment between Lucy and Nina and between Sue and Nina. He found Nina had a "significant, positive, reciprocal and secure emotional attachment" to Sue and that Sue was Nina's "psychological caretaker/parent." He also found that Nina had a "significant, positive emotional attachment" to Lucy and recognized Lucy

9

as a "parental caretaking figure," but he could not conclude Nina's attachment to Lucy was "a secure one" because of "the history of her removal and placement." Dr. Figurelli concluded the results of the bonding evaluation along with the results of the psychological evaluation and parenting assessment he had conducted in May supported the Division's plan to terminate Lucy's parental rights and place Nina with Sue for adoption and that that plan "most adequately meets [Nina's] permanency needs."

The guardianship trial took place in October 2021. The Division called three witnesses: a Division caseworker, Sue, and Dr. Figurelli as its expert. Defendant did not testify, call any witnesses, or present any evidence. The law guardian supported termination of Lucy's parental rights.

In addition to testifying about the referrals the Division had received concerning Lucy, the contact and communications the Division had had with and about Lucy, and the services the Division had offered to Lucy, the caseworker also testified about Lucy's visits with Nina, his observations of Nina, the Division's communications with Sue and other relatives, and the Division's belief that being adopted by Sue was in Nina's best interests. The caseworker characterized Lucy as attending visits with Nina "[s]poradic[ally]," missing visits on an average of two out of four weeks. He described Nina as "doing

10

well" and "thriving" in Sue's care. The caseworker confirmed he had discussed adoption and kinship legal guardianship (KLG) with Sue several times, he had presented to her and reviewed with her the KLG-versus-adoption fact sheet, and Sue agreed with the adoption plan. The caseworker explained the Division believed adoption by Sue was in Nina's best interests "[d]ue to ongoing concerns of substance abuse and lack of compliance of services, housing instability, issues concerning mental health and [Nina] . . . has been in the care of [Sue] since March 2020 and appears to be thriving at it."

During his testimony, Dr. Figurelli confirmed he had conducted a psychological evaluation of Lucy and a bonding assessment of the relationship between Lucy and Nina and the relationship between Sue and Nina. He testified that Lucy had indicated to him she had a history of problems with depression and anxiety and that "there was a relationship between the depression and anxiety on the one hand and her substance abusing behavior on the other hand." However, Lucy also told him she had not been depressed in a number of years but still had used PCP, leading him to believe she was using for other reasons. He found Lucy had a history of substance abuse, establishing abstinence while in treatment, and then relapsing "in response to difficult situations that occurred in her life." He believed that because of her history of self-medicating with

11

marijuana and PCP, she "required participation in intensive substance abuse treatment in order to address her substance abuse problem going forward."

Dr. Figurelli testified about his opinion that Lucy "was not in a position to parent and she did not have the capacity to parent safely and adequately." He testified that to show she had the capacity to parent safely, Lucy would have to demonstrate "a year of continuous abstinence" or "six months of sustained abstinence from any substance use with evidence that [she was] working [successfully] toward . . . that one-year period of abstinence." He testified about a child's need for "emotional permanency" and the impact a lack of permanency would have on a child. When asked why he had opined that adoption by Sue was the plan that most adequately met Nina's permanency needs, Dr. Figurelli explained:

> I had to take into consideration my assessment of the extent to which [Lucy] had been adequately able to address and effectively remediate and resolve the deficits and concerns through her parenting capacity that had been identified. And at that time that I evaluated her, or up to that point in time, the indication was that she had not been able to do that. So, that she wasn't in a position or able to parent safely and adequately, and that was an important consideration.
>
> On the other hand, given the nature of the attachment that the child had with her current caretaker, the fact that she appeared to be thriving in that placement, and the fact that it was a viable – it appeared to be a viable permanent placement plan, that would

12

foster [Nina's] adequate development and maturation over time, it appeared to me that a placement in the -- permanent placement in the resource caretaker's care was the most important permanent plan for the child.

With regard to why I recommended adoption versus any other potential permanent placement plan goes back to what I just said; and that is, that [Lucy] had not remediated those impediments to her capacity to parent most importantly safely and that, or consistently adequately, unfortunately, and that any contact as a result of that that she would have going forward should be at the sole discretion of her adoptive parent who would be in a position to be able to assess on behalf of the child, what, if any, was safe and appropriate contact with her birth mother going forward.

At the time of Sue's testimony, Nina had been living with Sue for two years. Sue described Nina as doing "very well" and as having a sibling relationship with Sue's thirteen-year-old child. Sue confirmed the Division had explained to her the difference between KLG and adoption. She testified she wanted to adopt Nina and that if she adopted her, she would allow Lucy to continue to visit Nina. Sue explained why she wanted to adopt Nina:

Because we've been going through this for the last two years and I don't really think it's fair for Nina to keep going through this and when she, when Lucy gets mad, she tries to get other family members involved, like to see if [Nina] can go with them, but Nina don't know the family member she tr[ies] to [have] take over. And I don't think that's fair to her. She's comfortable where she's at. She likes it where she's at. She's doing good.

13

In a written opinion that we discuss more fully below, the judge found each of the Division's witnesses credible and concluded the Division had carried its burden of proof as to all four prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. The judge entered the judgment of guardianship.

This appeal followed.

## II.

Our review of family-court decisions is "strictly limited." N.J. Div. of Youth & Fam. Servs. v. I.H.C., 415 N.J. Super. 551, 577 (App. Div. 2010); see also N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007) (finding our review of a "trial court's decision to terminate parental rights" to be "limited"). "[W]e apply a deferential standard in reviewing the family court's findings of fact because of its superior position to judge the credibility of witnesses and weigh the evidence," N.J. Div. of Child Prot. & Permanency v. J.R.-R., 248 N.J. 353, 368 (2021), and "because it possesses special expertise in matters related to the family," N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). "Particular deference is afforded to decisions on issues of credibility." G.L., 191 N.J. at 605. Thus, we are bound to accept the trial court's factual findings as long as they are supported by sufficient credible evidence. N.J. Div. of Child Prot. & Permanency v. A.D., 455 N.J. Super. 144, 155 (App.

Div. 2018); see also G.L., 191 N.J. at 605 (holding a trial court's findings are entitled to deference "unless it is determined that they went so wide of the mark that the judge was clearly mistaken"). We review de novo a judge's legal conclusions and statutory interpretations. In re Ridgefield Park Bd. of Educ., 244 N.J. 1, 17 (2020); N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014).

When the State seeks to terminate parental rights, the Division must prove by clear and convincing evidence each of the following:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a); see also F.M., 211 N.J. at 447.]

Those fact-sensitive factors "overlap with one another to provide a comprehensive standard that identifies a child's best interests." G.L., 191 N.J. at 606-07 (quoting In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999)).

## A.

"The first two prongs [of N.J.S.A. 30:4C-15.1(a)] . . . are 'the two components of the harm requirement' and 'are related to one another.'" N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 380 (App. Div. 2018) (quoting In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999)). "Therefore, 'evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child.'" Ibid. (quoting D.M.H., 161 N.J. at 379). Under the first prong, "the Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Dep't of Child. & Fams. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352). The Division need not "wait 'until a child is actually irreparably impaired by parental inattention or neglect.'" F.M., 211 N.J. at 449 (quoting D.M.H., 161 N.J. at 383). Under prong two, "the inquiry centers on whether the parent is able to remove the danger facing the child." Id. at 451. Prong two may be proved by "indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug

16

abuse, [and] the inability to provide a stable and protective home . . . ." K.H.O., 161 N.J. at 353; N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 592 (App. Div. 1996) (finding the "inability or unwillingness to resolve the problems with respect to . . . mental health and substance abuse" satisfies the second prong).

As to the first prong, the trial court found Nina had been harmed by Lucy's "addiction and inability to remediate her drug addiction and provide a safe and stable home." The court recognized Lucy previously had completed substance-abuse treatment but had relapsed at least twice and had failed to re-engage in substance-abuse treatment since her last relapse. The court found no evidence that Lucy would be able to complete successfully a substance-abuse program and remain sober for a twelve-month period, which, as Dr. Figurelli testified, was needed for Lucy to demonstrate she had the ability to safely parent and care for Nina. The court recognized it was against a child's best interest to delay resolution of his or her status when a parent is unable to care for the child for a prolonged period and held that continuing the parental relationship would "impair [Nina's] development, health, and safety."

As to the second prong, the court found Lucy had not "corrected the circumstances that led to the removal of her child" and had not been able to

17

refrain from abusing PCP for the necessary twelve-month period. The court concluded it was "unlikely [Lucy] will be able to provide a safe and stable home for [Nina] now or in the foreseeable future." Relying on the "uncontroverted expert testimony of Dr. Figurelli," the court held the Division had proven that Lucy, by her failure to address her substance-abuse and emotional issues, was unable or unwilling to eliminate the harm she and her addiction presented to Nina and that "delaying permanent placement will add to the harm."

Defendant argues Lucy's two admitted instances of relapse and Dr. Figurelli's testimony are not sufficient to demonstrate imminent risk of harm under the first prong and Lucy's unwillingness or inability to eliminate that harm under the second prong. In making that argument, defendant relies on New Jersey Division of Youth and Family Services v. V.T., 423 N.J. Super. 320 (App. Div. 2011). That reliance is misplaced.

In V.T., an abuse-and-neglect case, we held the Division had not demonstrated that a parent, who had relapsed after participation in one marijuana-abuse treatment program, posed a risk to his child during supervised visits with the child. This is not an abuse-and-neglect case involving visits by a parent in a supervised setting. As held by the trial court, the record evidence in this case demonstrates clearly and convincingly Lucy has a PCP addiction,

she has a history of denying and minimizing her substance-abuse problem, her multiple efforts to treat her addiction did not result in sustained sobriety, and, at the time of trial, she had failed to engage in additional treatment following her most recent relapse and was making no effort to address her substance-abuse issue. "[T]he continuing inability of the mother to overcome her own addiction in order to care for her child constitutes endangerment of the child." K.H.O., 161 N.J. at 363. The record evidence of Lucy's relapses satisfies prong one because her relapses demonstrate her inability to overcome her addiction and that inability to overcome her addiction endangers her child. Her failure to engage in substance-abuse treatment after her latest relapse demonstrates her unwillingness or inability to eliminate the harm facing Nina and, thus, satisfies prong two. B.G.S., 291 N.J. Super. at 592.

"[T]he potential future harm caused by a 'delay of permanent placement' is also a consideration" under the second prong. N.J. Div. of Youth & Fam. Servs. v. T.S., 417 N.J. Super. 228, 244 (App. Div. 2010) (quoting N.J.S.A. 30:4C-15.1(a)(2)). The trial court found credible Dr. Figurelli's testimony and, based on that testimony, held a delay in establishing a stable and permanent home would cause harm to Nina. We see no reason to divest that finding of the "[p]articular deference" we afford "decisions on issues of credibility." G.L., 191

19

N.J. at 605. That Lucy's responses to "self[-]report measures" indicated she was not "experienc[ing] clinically significant symptoms of a diagnosable psychiatric illness or clinical syndrome that requires formal mental health treatment" does not minimize or eliminate Dr. Figurelli's other findings, including his findings, based in part on Lucy's admissions, regarding her substance-abuse problem and her incapacity to parent Nina in a safe and stable manner.

B.

The first part of the third prong requires the Division to make "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home[.]"  N.J.S.A. 30:4C-15.1(a)(3).  That provision of the statute "contemplates efforts that focus on reunification of the parent with the child and assistance to the parent to correct and overcome those circumstances that necessitated the placement of the child."  K.H.O, 161 N.J. at 354.

The trial court found the Division had made a number of reasonable efforts in this case, including referring Lucy to several substance-abuse, psychiatric, and psychological evaluations and to multiple substance-abuse and counseling programs, offering random drug screens, and putting in place safety plans

20

enabling Lucy to have on-going contact with Nina. That finding is supported by substantial, credible evidence in the record.

Defendant does not challenge the reasonableness of the efforts made by the Division. Instead, she argues those efforts were unnecessary given Dr. Figurelli's finding that Lucy was not "experienc[ing] clinically significant symptoms of a diagnosable psychiatric illness or clinical syndrome that requires formal mental health treatment." She also contends that that finding somehow renders Dr. Figurelli's recommendation that Lucy engage in substance-abuse services a net opinion. With those arguments, defendant again ignores Dr. Figurelli's opinions regarding Lucy's substance-abuse problem and the record evidence, including Lucy's admissions, of her drug use. Conceding she relapsed twice, Lucy blames her latest relapse on the Division, but, at trial, she did not present any expert testimony supporting that contention or disputing Dr. Figurelli's findings.

The second part of prong three requires the court to "consider[] alternatives to termination of parental rights[.]" N.J.S.A. 30:4C-15.1(a)(3). Those alternatives may include placement of the child with a relative caretaker, N.J.S.A. 30:4C-12.1(a), or the establishment of a KLG, N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 222 (2010).

21

The trial court found the Division had explored possible relatives and friends and had placed Nina with her maternal aunt Sue, who wanted to adopt Nina and did not want a KLG. Accordingly, the court found no alternatives to termination of parental rights existed. Based on recent statutory amendments, defendant argues that finding was erroneous.

The Legislature amended N.J.S.A. 30:4C-15.1(a)(2) on July 2, 2021. The Legislature deleted what had been the second sentence of N.J.S.A. 30:4C-15.1(a)(2), which read: "Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child." L. 2021, c. 154., § 9. With that amendment, the Legislature confirmed the Division cannot prove the harm referenced in the second prong based on the effects of terminating the child's bond with a resource parent. See N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 169-170 (2010) (acknowledging "[i]t is well-established that the period of time a child has spent in foster care is not determinative of whether parental rights to that child should be terminated . . . .").

The Legislature also amended N.J.S.A 3B:12A-6(d)(3), which is part of the Kinship Legal Guardianship Act, N.J.S.A. 3B:12A-1 to -7. See L. 2021, c.

154, § 4. N.J.S.A. 3B:12A-6 is entitled "[c]onsiderations for appointment as kinship legal guardian." Paragraph (d) of that statute provides:

> d. The court shall appoint the caregiver as a kinship legal guardian if, based upon clear and convincing evidence, the court finds that:
>
> > (1) each parent's incapacity is of such a serious nature as to demonstrate that the parents are unable, unavailable or unwilling to perform the regular and expected functions of care and support of the child;
> >
> > (2) the parents' inability to perform those functions is unlikely to change in the foreseeable future;
> >
> > (3) in cases in which the [D]ivision is involved with the child as provided in [N.J.S.A. 30:4C-85(a)], the [D]ivision exercised reasonable efforts to reunify the child with the birth parents and these reunification efforts have proven unsuccessful or unnecessary; and
> >
> > (4) awarding kinship legal guardianship is in the child's best interests.

Before the July 2, 2021 amendment, N.J.S.A. 3B:12A-6(d)(3) included the phrase "and (b) adoption of the child is neither feasible nor likely." N.J.S.A. 3B:12A-6(d)(3) (2006). Thus, the July 2, 2021 amendment removed from KLG

appointments the requirement that adoption be "neither feasible nor likely," thereby permitting KLG appointments when adoption is also an option.

These statutory amendments did not change the guiding principle of child-guardianship cases:  courts must decide cases based on the best interests of the child.  See F.M., 211 N.J. at 447 (finding "[t]he focus of a termination-of-parental-rights hearing is the best interests of the child").  The Legislature did not delete (d)(4) of the KLG statute, which requires a court, before granting a KLG, to find that "awarding [KLG] is in the child's best interest."  N.J.S.A. 3B:12A-6(d)(4).  Although the appointment of a KLG no longer requires that "adoption of the child is neither feasible nor likely," it still must be in the best interests of the child.

And in this case, the court found adoption, not KLG, was in Nina's best interests.  That finding was not based on harm caused by severing Nina's bond with Sue or merely by an uninformed preference for adoption but on the court's determination of what was in Nina's best interest.  The court's finding that adoption was in Nina's best interest was supported by the testimony of each witness, including Dr. Figurelli, who explained why he found adoption by Sue was the permanency plan best suited to meeting Nina's needs, and Sue, who explained why she believed adoption was best for Nina, testifying about Lucy's

24

attempts, when she "gets mad," to move Nina to family members Nina does not know and how it was not "fair for [Nina] to keep going through this."

Moreover, KLG was not a viable option, and, accordingly, Lucy did not argue at trial for KLG. After discussing the KLG option with the Division, Sue rejected that option and chose adoption. She explained her rationale clearly at trial. Contrary to Lucy's contention, the record evidence confirms Sue's decision to adopt Nina was "not only informed, but also unconditional, unambiguous, and unqualified." N.J. Div. of Child Prot. & Permanency v. M.M., 459 N.J. Super. 246, 264 (App. Div. 2019). Lucy also questions the testimony of the Division caseworker about the Division's efforts to identify other family members able or willing to care for Nina. The court accepted his testimony, and we see no basis to overturn that credibility finding.

## C.

The fourth prong of the statute requires the court to determine that termination "will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). It serves as a "'fail-safe' inquiry guarding against an inappropriate or premature termination of parental rights." F.M., 211 N.J. at 453 (quoting G.L., 191 N.J. at 609). "The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely

terminating the child's relationship with th[e] parent." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 108 (2008). "The crux of the fourth statutory subpart is the child's need for a permanent and stable home, along with a defined parent-child relationship." N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 226 (App. Div. 2013). "Overall, the court's focus should be on the child's need for permanency." Ibid.

Lucy faults the court and Dr. Figurelli for not making a "baseline determination" of the harm that would be caused by the termination of Lucy's parental rights and contends the court did not render sufficient findings on that issue pursuant to Rule 1:7-4(a). We disagree.

In finding the Division had proven the fourth prong, the court recognized that a child's bond with a foster parent "does not alone justify the termination of parental rights," citing N.J. Div. of Youth & Fam. Servs. v. F.M., 375 N.J. Super. 235, 263-64 (2005). The court found that although Lucy and Nina had a "significant, positive attachment," Lucy was not Nina's psychological parent and had been "unable to successfully remain drug free despite having successfully complet[ed] two substance abuse treatment programs." The court concluded "there is no viable parent that can now or in the foreseeable future safely parent" Nina and that it was in Nina's best interests to terminate Lucy's parental rights.

The ultimate determination on the fourth prong cannot be made simply by showing "the child has bonded with foster parents who have provided a nurturing and safe home" or that terminating parental rights "likely will not do more harm than good" because it would provide the child with the benefit of a "permanent placement with a loving family." E.P., 196 N.J. at 108. Nor can it be made simply on a finding that the bond with the foster parent is stronger than the bond with the biological parent because that is an expected result of an early or lengthy removal. G.L., 191 N.J. at 608-09. However, termination is appropriate when the absence of permanency would cause harm and when the parent is unlikely, in the reasonably foreseeable future, to become capable of primary caregiving for the child without risking harm. See, e.g., N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 491-92 (App. Div. 2012). That is the case here.

A fair reading of both Dr. Figurelli's testimony and the court's findings make clear that the prong-four evidence was analyzed in light of all the evidence regarding the other statutory prongs. The findings were not a mere comparison between Lucy's home and Sue's home. They reflected earlier findings that it was unlikely Lucy any time in the near future could ameliorate the harm caused by her drug use to provide Nina with the permanency she needs. That evaluation

of the fourth-prong proofs reflects the "extremely important consideration pursuant to this prong" of "a child's need for permanency." R.G., 217 N.J. at 559. "Keeping the child[ren] in limbo, hoping for some long[-]term unification plan, would be a misapplication of the law." N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001); see also N.J. Div. of Child Prot. & Permanency v. S.D., 453 N.J. Super. 511, 524 (App. Div. 2018) (finding "[p]arents do not have the right to extend litigation indefinitely until they are able to safely care for their children . . . .").

D.

Lucy argues defense counsel's failure to address the effect of the recent statutory amendments constituted ineffective assistance of counsel warranting reversal. We disagree.

A defendant in a parental-rights-termination case has a constitutional right to effective counsel. N.J. Div. of Youth & Fam. Servs. v. B.R., 192 N.J. 301, 306 (2007). To establish an ineffective-assistance-of-counsel claim in a parental-rights-termination case, a defendant must meet the two-prong test established in Strickland v. Washington, 466 U.S. 668, 687 (1984), and adopted in State v. Fritz, 105 N.J. 42 (1987). The test requires the defendant show trial counsel's performance was deficient and that, but for the deficient performance,

the result would have been different. B.R., 192 N.J. at 307-09. A court reviews the claim under "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"; the defendant must overcome the presumption that the challenged action was part of a "'sound trial strategy.'" Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)); see also B.R., 192 N.J. at 307-08.

Defendant has not met the Strickland/Fritz test. Defendant fails to establish either counsel or the court was unaware of the amended statutes. The court in its decision correctly quoted language from the amended version of N.J.S.A. 30:4C-15.1(a)(2). Defendant has not overcome the presumption that not raising the recent amendments, especially the amendments to the KLG Act, was part of a trial strategy aimed at returning Nina to Lucy's care. Finally, for the reasons we articulate above, defendant has not shown that raising the recent statutory amendments would have led to a different result. See State v. Echols, 199 N.J. 344, 361 (2009) (finding an attorney is not deficient for failing to raise a losing argument at trial).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1026-21